

U.S. Department of Justice

United States Attorney
Eastern District of New York

KDE:MEG/JS

271 Cadman Plaza East
Brooklyn, New York 11201

June 24, 2020

By ECF

The Honorable Cheryl L. Pollak
Chief United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:    United States v. Tyshawn Corbett, et al.
              Criminal Docket No. 20-213 (KAM)

Dear Chief Judge Pollak:

      The government respectfully submits this letter in support of its application for the entry of a permanent order of detention pending trial for each of the defendants charged in the above-referenced case. The defendants are members and associates of a violent set of the Bloods street gang, the Elite Assassin Millas ("EAM"), who—as the name would suggest—sought to stalk, shoot and kill individuals with whom they were at odds. The charged conduct covers five shootings over a three-year period that left one EAM rival dead, and two others paralyzed. For the reasons set forth more fully below, the government submits that the defendants are both a flight risk and a danger to the community, and no combination of conditions can secure their appearance at trial and the safety of the community.

I.    The Defendants' Crimes

    A.    Background

      In the summer of 2018, a series of shootings in East New York, Brooklyn, prompted the Federal Bureau of Investigation ("FBI") and the New York City Police Department ("NYPD") to begin an investigation into criminal activity committed by the suspected perpetrators of that violence, EAM members and associates. EAM is a set of the Bloods street gang that was created in approximately 2006 and follows many of the rules and hierarchical structure of other Bloods sets. Members and associates of EAM employ illicit means to earn money, including drug-trafficking and fraud. The core tenets of the gang, as

revealed in the "21 second oath and pledge," which was recovered from the cellphone of an EAM member pursuant to a warrant, include an undying devotion to fellow members and an unrelenting commitment to employ violence against rivals:

> It take 21 seconds, 2 be blood, being blood is about respecting your family and doing what you could, learning 2 love and trust your brothers and sisters while protecting ur hood, left over my heart is how I be, then it's death 2 my enemies. I take this oath in total devotion and dedication, representing ride or die, or its death that I'm facing. . . . East be the way by milla I stay.

The investigation revealed that in recent years, defendant Quandel Smothers, also known as "Chucky" ("SMOTHERS"), has held the highest-ranking position of "Godfather" and that defendant Andrew Campbell, also known as "Phaze" ("CAMPBELL"), was also a member of the gang's leadership, albeit it at a lower level than SMOTHERS.

B.   Relevant Acts of Violence

On April 30, 2011, SMOTHERS shot a fellow E.A.M. member whom SMOTHERS believed intended to harm a third member of the gang over a drug-related dispute; as a result, the victim's leg was amputated. SMOTHERS was arrested for the offense shortly thereafter and charged with attempted murder, but ultimately pled the charge down to Attempted Criminal Possession of a Weapon in the Second Degree (Loaded Firearm).[1]

Years later, on March 25, 2015, a beloved member of EAM was shot and killed in East New York, Brooklyn. Almost immediately, members and associates of EAM sought to retaliate by locating and killing those they believed to be responsible for his death. Approximately one month later, on April 21, 2015, defendant Tyshawn Corbett, also known as "Reck" ("CORBETT") shot and killed Michael Tenorio on McKinley Avenue in East New York, Brooklyn. Surveillance video of the murder shows that defendant CORBETT chased Tenorio down the residential block while firing at him repeatedly, including while standing over Tenorio after he had fallen to the ground.

The following year, on March 7, 2016, defendant CORBETT shot an individual (identified as "John Doe #1" in the Indictment) while he was walking on Shepard Avenue in East New York, Brooklyn. Surveillance video shows the shooter (later determined to be CORBETT) apparently lying in wait near a vehicle parked on the

---

[1] Although the government will seek to introduce evidence of this shooting as proof of SMOTHERS' membership in the Racketeering Conspiracy with which he is charged, it is not charged as a substantive offense because it occurred outside the statute of limitations period.

2

residential street before running onto the sidewalk on which John Doe #1 was walking and firing at him from close range.  John Doe #1 survived the shooting, but was then shot by defendant CORBETT again more than two years later.

Specifically, on June 28, 2018, defendant CORBETT shot John Doe #1 while he sat in the driver seat of a car parked in Jamaica, Queens, paralyzing him.  Moments after the shooting, CORBETT successfully fled the scene in a car driven by defendant and fellow EAM member, Desmonn Beckett, also known as "Des" ("BECKETT").  The June 28 shooting was the culmination of extensive efforts to stalk and kill John Doe #1 by defendant CORBETT, defendants and brothers Marlon Bristol, also known as "Marlo" ("MARLON") and Devon Bristol, also known as "D" ("DEVON"), and others.  Those efforts included the use of a GPS tracking device that law enforcement officers recovered from John Doe #1's car after the shooting.

Around the same time, a feud developed between members of EAM and another individual (identified as John Doe #2 in the Indictment).  Surveillance video from a June 10, 2018 violent confrontation between defendant CORBETT and John Doe #2 shows the two men engage in a fistfight.  A short time later, shots were fired in the area from two separate weapons; no one was struck.  Law enforcement officers later recovered one of the firearms used in incident from a storage unit maintained by defendant CORBETT under a false name.

The feud continued with additional acts of back and forth violence and other members of EAM took up the cause, vowing to retaliate against John Doe #2.  Defendants and EAM members Qawon Allen, also known as "40" and "Phorty Wap" ("ALLEN") and CAMPBELL conspired with others to locate and kill John Doe #2.  While defendant CAMPBELL sought to enlist other members of the gang to track down and kill the intended victim (stating in a text message, "I put the word out that he gotta go not that he just gotta get smoked"), defendant ALLEN provided the firearm that was ultimately used by another member of the gang to shoot John Doe #2.  On July 28, 2018, John Doe #2 was shot repeatedly on Glenmore Avenue in East New York, Brooklyn.  He survived, but the shooting left him paralyzed.

II.     The Defendants' Criminal Histories and Additional Relevant Information

As detailed below, each of the defendants, save one, have prior convictions for weapons and/or narcotics offenses.

A.     Tyshawn Corbett, also known as "Reck"

CORBETT is charged in the Indictment with Racketeering Conspiracy; Murder In-Aid-Of Racketeering and Causing Death Through Use of a Firearm (related to the April 21, 2015 shooting of Michael Tenorio); three counts each of Attempted Murder In-Aid-Of Racketeering and Assault In-Aid-Of Racketeering and one count each of Conspiracy to Commit Murder In-Aid-Of Racketeering and Interstate Stalking (related to the March 7, 2016 and June 28, 2018 shootings of John Doe #1 and the June 10, 2018 shooting of John Doe #2); and five counts of Unlawfully Using Firearms. If convicted of these crimes, CORBETT faces a mandatory minimum sentence of life in prison, and is eligible for the death penalty.

CORBETT, who is 30 years old, is currently incarcerated at the Metropolitan Detention Center ("MDC") awaiting sentencing following his February 13, 2020 plea of guilty before the Honorable I. Leo Glasser to Unlawful Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1).[2] He was arrested for that offense on January 1, 2019, during the pendency of the FBI/NYPD investigation and while serving a sentence of probation for a prior New York state drug conviction. CORBETT has the following felony convictions:

- On April 17, 2017, CORBETT was convicted by plea of guilty to Criminal Possession of a Controlled Substance in the Fifth Degree (Cocaine 500 Milligrams), a class D felony under New York Penal Law § 220.06(5), and subsequently sentenced to six months' imprisonment and five years' probation. The maximum expiration date of CORBETT's term of probation is April 26, 2022.[3]

- On November 28, 2012, CORBETT was convicted by plea of guilty to Attempted Criminal Sale of a Controlled Substance in the Third Degree (Narcotic Drug), a class

---

[2] In addition to pleading guilty to 18 U.S.C. § 922(g)(1), the defendant also stipulated in the plea agreement to his possession of fifteen plastic bags containing cocaine base that he intended to distribute and two additional firearms.

[3] CORBETT was arrested for this offense on October 31, 2015, after he was found in possession of 22 twists of crack cocaine and over $10,000 following a car stop in East New York, Brooklyn.

4

C felony under New York Penal Law § 220.39(1), and subsequently sentenced to 18 months' imprisonment, plus 18 months' post-release supervision.[4]

- On February 16, 2010, CORBETT was convicted by plea of guilty to Attempted Criminal Sale of a Controlled Substance in the Third Degree (Narcotic Drug), a class C felony under New York Penal Law § 220.39(1), and subsequently sentenced to one year in custody.[5]

B.   QUANDEL SMOTHERS also known as "Chucky"

SMOTHERS, the highest-ranking member of EAM among the defendants, is charged in the Indictment with Racketeering Conspiracy (which extends to the 2011 shooting he committed) and Unlawful Use of Firearms. If convicted of these crimes, SMOTHERS faces a mandatory minimum sentence of five years in prison and a maximum sentence of life in prison.

SMOTHERS, who is 29 years old, has the following felony convictions:

- On May 4, 2016, SMOTHERS was convicted upon a plea of guilty to Attempted Criminal Possession of a Weapon (Previous Conviction), a class E felony under New York Penal Law § 265.02(1), and subsequently sentenced to one-and-a-half to three years' imprisonment.[6] SMOTHERS was released from custody on September 19, 2016[7], and his parole term expired on October 26, 2019.

- On August 13, 2013, SMOTHERS was convicted upon a plea of guilty to Attempted Criminal Possession of a Weapon in the Second Degree (Loaded Firearm), a class D felony under New York Penal Law § 265.03(3), and subsequently sentenced to one to three years' imprisonment. SMOTHERS was released from custody on March 28,

---

[4] CORBETT was arrested for this offense on September 12, 2011, after selling a controlled substance on the northeast corner of Essex Street and Pitkin Avenue in Brooklyn.

[5] CORBETT was arrested for this offense on June 2, 2009, after selling a controlled substance in front of 179 Milford Street in Brooklyn.

[6] SMOTHERS was arrested for this offense on June 16, 2014 after pointing a firearm at a member of the NYPD; a firearm was recovered from the scene.

[7] SMOTHERS was arrested for this offense on June 16, 2014. On July 2, 2014, he was returned on a warrant and arraigned on the indictment. Given his September 19, 2016 release date, he likely remained incarcerated continuously following his return on the warrant on July 2, 2014.

5

2014[8], and his parole term was revoked on September 6, 2016, following his conviction on the gun crime detailed above.

C.  Qawon Allen, also known as "40" and "Phorty Wap"

ALLEN is charged in the Indictment with Racketeering Conspiracy; Conspiracy to Commit Murder In-Aid-Of Racketeering, Attempted Murder In-Aid-Of Racketeering and Assault In-Aid-Of Racketeering (all related to the July 28, 2018 shooting of John Doe #2); and two counts of Unlawful Use of Firearms. If convicted of these crimes, ALLEN faces a mandatory minimum sentence of 15 years in prison, and a maximum sentence of life in prison.

ALLEN, who is 26 years old, is currently incarcerated at the MDC awaiting sentencing following his January 9, 2020 plea of guilty to violating 18 U.S.C. § 924(c)(1)(A)(ii) for Brandishing a Firearm During a Crime of Violence; in that case, the robbery of a marijuana trafficker at gunpoint that he committed with an accomplice. He also has a pending felony case in New York County Supreme Court for identity theft offenses. ALLEN has the following felony convictions:

- On January 22, 2014, ALLEN was convicted at trial of Grand Larceny in the Fourth Degree (Property Taken from a Person), a class E felony under New York Penal Law § 155.30(5), and was subsequently sentenced to two to four years' imprisonment. ALLEN was released from custody on February 11, 2016; he was discharged from parole on June 16, 2017.

- On November 21, 2011, ALLEN was convicted by plea of guilty to Criminal Sale of a Controlled Substance in the Third Degree (Narcotic Drug), a class B felony under New York Penal Law § 220.39(1), and was subsequently sentenced to two years' imprisonment, plus one year of post-release supervision. ALLEN was released from custody on August 31, 2012; his parole was revoked on April 21, 2014 following his conviction in the Grand Larceny case detailed above.

D.  Marlon Bristol, also known as "Marlo"

MARLON is charged in the Indictment with Racketeering Conspiracy; Conspiracy to Commit Murder In-Aid-Of Racketeering and Interstate Stalking (related to the June 28, 2018 shooting of John Doe #1); and Unlawful Use of a Firearm. If convicted of

---

[8] SMOTHERS was arrested for this offense on August 24, 2011, and was charged by indictment with Attempted Murder, Assault in the First Degree (Intent to Cause Serious Injury with a Weapon), and other offenses.

these crimes, MARLON faces a mandatory minimum sentence of five years in prison, and a maximum sentence of life in prison.

MARLON, who is 32, was arrested as recently as April 10, 2020, and charged with Aggravated Harassment in the Second Degree (Threat by Phone/Computer/Mail), a class A misdemeanor, and related offenses; the case remains pending in the Kings County Criminal Court. He also has the following felony convictions[9]:

- On November 15, 2011, MARLON was convicted upon a plea of guilty to Criminal Sale of a Controlled Substance in the Fifth Degree, a class D felony under New York Penal Law § 220.31, and subsequently sentenced to 30 months' imprisonment, plus two years of post-release supervision. MARLON was released on January 15, 2015, and was subsequently discharged from parole on October 25, 2017.

- On December 14, 2010, MARLON was convicted upon a plea of guilty to Criminal Sale of a Controlled Substance in the Fifth Degree, a class D felony under New York Penal Law § 220.31, and subsequently sentenced to two years' imprisonment, plus two years of post-release supervision. MARLON bench warranted while his sentence was pending and was therefore not sentenced until May 22, 2014.

- On February 7, 2006, MARLON was convicted upon a plea of guilty to Criminal Sale of a Controlled Substance in the Fifth Degree, a class D felony under New York Penal Law § 220.31, and subsequently sentenced to one year of imprisonment, plus one year of post-release supervision. MARLON was released on October 19, 2017, and was subsequently discharged from parole on October 20, 2008.

E. Devon Bristol, also known as "D"

DEVON is charged in the Indictment with Racketeering Conspiracy; Conspiracy to Commit Murder In-Aid-Of Racketeering and Interstate Stalking (related to the June 28, 2018 shooting of John Doe #1); and Unlawful Use of a Firearm. If convicted of these crimes, DEVON faces a mandatory minimum sentence of five years in prison, and a maximum sentence of life in prison.

DEVON, who is 29 years old, twice had bench warrants issued for his arrest in 2019 after he failed to comply with the terms of two conditional discharge sentences he was afforded for violations; in both instances, he was resentenced to a custodial term. DEVON also has the following felony conviction:

---

[9] In addition, MARLON was convicted of misdemeanor offenses in 2014, 2016 and 2017.

7

- On October 21, 2015, DEVON was convicted by plea of guilty to Attempted Criminal Sale of a Controlled Substance in the Third Degree (Narcotic Drug), a class B felony under New York Penal Law § 220.39(1), and subsequently sentenced to a five years' probation, which is due to expire on December 7, 2020.

G.   DESMONN BECKETT, also known as "Des"

BECKETT is charged in the Indictment with Accessory After-The-Fact to Attempted Murder In-Aid-Of Racketeering and Assault In-Aid-Of Racketeering (related to driving CORBETT to and from the June 28, 2018 shooting of John Doe #1). If convicted of this offense, BECKETT faces a maximum sentence of ten years in prison.

BECKETT, who is 27 years old, has the following criminal conviction:

- On January 18, 2017, BECKETT was convicted upon a plea of guilty to Criminal Possession of a Weapon in the Fourth Degree (Firearm/Weapon), a class A misdemeanor under New York Penal Law § 265.01(1), and subsequently sentenced to a conditional discharge.

H.   ANDREW CAMPBELL, also known as "Phaze"

CAMPBELL, the second-highest ranking member of EAM among the defendants, is charged in the Indictment with Conspiracy to Commit Murder In-Aid-Of Racketeering (related to the July 28, 2018 shooting of John Doe #2). If convicted of this crime, CAMPBELL faces a maximum sentence of ten years in prison.

CAMPBELL, who is 24 years old, has no criminal convictions.

III.   Legal Standard and Procedure

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. 18 U.S.C. § 3142(e). While a finding of dangerousness must be supported by clear and convincing evidence, United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995), risk of flight can be proven by a preponderance of the evidence, United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987).

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history). Indeed—and significantly—danger to the community includes "the harm to society caused by [the likelihood of continued] narcotics trafficking." United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985). In addition—and also significantly—when a finding of dangerousness is related to violent conduct, it need not be shown that the

8

defendant personally engaged in violence. United States v. Colombo, 777 F.2d 96, 98 (2d Cir. 1985).

A rebuttable presumption of dangerousness and risk of flight arises when a defendant is charged with "an offense under section 924(c) . . . ." 18 U.S.C. § 3142(e)(3)(B). The presumption means that the Court must initially assume there is "no condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of any other person and the community." Id. The defendant must come "forward with evidence that he does not pose a danger to the community or a risk of flight." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001). Even if the defendant were to meet his burden of production, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." Id.

Four factors guide the Court's determination of whether a defendant should be released on bail:

(1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . firearm . . .";

(2) "the weight of the evidence against the person";

(3) "the history and characteristics of the person, including . . . the person's character, . . . past conduct, . . . [and] criminal history, and record concerning appearance at court proceedings"; and

(4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

18 U.S.C. § 3142(g).

Evidentiary rules do not apply at detention hearings, and the government is entitled to present evidence by way of proffer, among other means. See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000). In the pre-trial context, few detention hearings involve live testimony or cross-examination. Most proceed on proffers. Id. at 131. This is because bail hearings are "typically informal affairs, not substitutes for trial or even for discovery." Id. (internal quotation marks omitted). Indeed, the Second Circuit has reversed district courts where they have not credited the government's proffer, including proffers with respect to a defendant's dangerousness. See, e.g., Mercedes, 254 F.3d at 437 ("Roman has twice been convicted of weapon possession – one felony conviction, and one misdemeanor conviction. We find the district court committed clear error in failing to credit the government's proffer with respect to Roman's dangerousness.").

IV.     Argument

    A.     The Defendants Pose a Danger to the Community

No bail package will protect the community from the danger posed by the charged defendants. Here, each of the four factors set forth in Section 3142(g) militate in favor of their pretrial detention, and there is a rebuttable presumption that each of the defendants, save for BECKETT and CAMPBELL, pose a danger and a risk of flight and therefore should be detained.

First, the violent conduct with which the defendants are charged—murder, murder conspiracy, attempted murder, assault, accessory to an attempted murder and firearms offenses—is incredibly serious. The violence extends over a significant period of time and reveals the relentlessness and callousness with which the defendants pursued and sought to kill rivals whom they believed had disrespected the gang and its members. To accomplish that goal, certain defendants employed increasingly drastic measures, including using a GPS tracking device to stalk one of their intended targets until he could be located and shot while sitting in a parked car. The defendants' years-long crime wave left devastating losses in their wake—one man is dead, one man is a partial amputee and two others remain paralyzed.

Second, the defendants all pose a danger based on their membership in or close association with EAM, a violent criminal enterprise that expects its members to fully subscribe to the tenant that violence must is necessary when the reputation of the gang or its members is at stake—"I take this oath in total devotion and dedication, representing ride or die, or its death that I'm facing." The risk posed by an individual who voluntarily adopts this as part of their personal ethos is heightened significantly when that individuals has ready access to firearms, as the defendants charged here clearly do and have for many years.

As set forth above, SMOTHERS and CAMPBELL hold significant positions of authority within the criminal organization. As a result, they have made a commitment to using violence to protect the interests of the gang, and to generating money through illegal activity on a continuing basis to ensure the gang's "kitty" is constantly flush. That level of commitment to a criminal cause does not yield to the law.

Third, the defendants' willingness to put their own interests and those of the gang above the safety of the community is apparent from the fact that most of the defendants have extensive criminal records—including weapons and drug-trafficking offenses. That is why the Second Circuit has repeatedly rejected elaborate bail packages for violent defendants, even ones that include "home detention and electronic monitoring," which the Court has explained try to "replicate a detention facility without the confidence of security such a facility instills. If the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendant] that [he] will obey the conditions." United States v. Millan, 4 F.3d 1039, 1049 (2d Cir. 1993) (citation and internal quotation marks omitted).

    B.    <u>The Defendants Pose a Risk of Flight</u>

The defendants all pose a significant risk of flight given the fact that, with the exception of CAMPBELL and BECKETT, they face mandatory minimum sentences of five or more years in prison and maximum sentences of life in prison.

When the incentive to flee is so strong, no combinations of sureties and other restrictions can assure their appearance. <u>See, e.g.</u>, <u>United States v. English</u>, 629 F.3d 311, 321-22 (2d Cir. 2011) (affirming detention in part because the defendant was charged under § 924(c), faced a presumption against release, and a mandatory minimum sentence that incentivized fleeing); <u>United States v. Henderson</u>, 57 F. App'x. 470, 471 (2d Cir. 2003) (summary order) ("the presumption regarding flight risk has changed because Becton now faces a ten-year mandatory minimum sentence"). That remains true even if the defendants accept electronic surveillance and home confinement. <u>See</u> <u>United States v. Orena</u>, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal quotation marks omitted).

V.    <u>Conclusion</u>

For the foregoing reasons, the government respectfully requests that the court issue permanent orders of detention against the defendants to ensure their return to court and the safety of the community.

                          Respectfully submitted,

                          RICHARD P. DONOGHUE
                          United States Attorney

By:         /s/
                  Margaret E. Gandy
                  Jonathan Siegel
                  Assistant U.S. Attorneys
                  718-254-7000

cc:    The Hon. Kiyo A. Matsumoto (by ECF)
       Clerk of Court (KAM) (by ECF)
       Defense Counsel (by ECF)