UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
UNITED STATES OF AMERICA,

                                            <u>**MEMORANDUM AND ORDER**</u>

   -against-                         20-CR-213 (KAM)


QUANDEL SMOTHERS,
Also known as "Chucky,"
                    Defendant.
------------------------------------X

**MATSUMOTO, United States District Judge:**

         An indictment, filed on June 18, 2020, charges that between 2006 and 2019, Defendant Quandel Smothers, also known as "Chucky" ("Mr. Smothers"), was involved with others in a racketeering conspiracy (Count I) and possessed a firearm during a drug trafficking crime (Count II). (ECF No. 1 ("Indictment").)[1] The charges arise from Mr. Smothers' alleged involvement in a group known as "Elite Assassin Millas" ("E.A.M."), a subgroup of the Bloods street gang. (*Id*. at 1.) The Indictment alleges:

> E.A.M., including its leadership, membership and associates, constituted an "enterprise" as defined in 18 U.S.C. § 1959(b)(2) and 1961(4), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

---

[1] All pin citations to the record refer to the page number assigned by the court's CM/ECF system.

(*Id*. at 2.)

Pending before the court are the government's motions to admit evidence of certain crimes and acts not charged in the Indictment that the government contends is: (1) direct evidence of and inextricably intertwined with the charged racketeering conspiracy and firearm possession offense, and/or in the alternative, (2) admissible pursuant to Federal Rule of Evidence 404(b) ("Rule 404(b)").  (*See generally* ECF No. 231, Gov't Mot.; ECF No. 275, Gov't Supp. Mot.).  Mr. Smothers opposes the government's motions *in limine*, and separately moves *in limine* to exclude evidence of certain 2018 correctional facility phone calls.  (ECF No. 232, Smothers Mot.; ECF No. 236, Smothers Opp.; ECF No. 287, Smothers Supp. Opp.)  Based on the court's review of the parties' motions, which were fully submitted on January 17, 2023, and for the reasons set forth below, the court grants the government's motions except to the extent qualified herein, and denies Mr. Smothers' motion.

## BACKGROUND

The government's motions seek to admit evidence of Mr. Smothers' uncharged crimes and other activities of Mr. Smothers and his-conspirators.  Specifically, the government has organized the evidence it seeks to introduce into the following categories: (i) acts allegedly committed during and in furtherance of the conspiracy, between 2006-2019, the time

2

period charged in Count I of the Indictment, (ii) evidence regarding the inception of E.A.M. and Defendant's prior gang affiliates and criminal activities, (iii) E.A.M.'s methods and means of exercising control over its membership, (iv) the facts of Mr. Smothers' prior incarcerations and prior convictions and records of imprisonment, (iv) prior identifications of Mr. Smothers pursuant to Federal Rule of Evidence 801(D)(1)(C), (v) 9-1-1 calls, (vi) a car stop of co-defendant Tyshawn Corbett, (vii) a search of Mr. Corbett's storage locker, and (vii) statements and communications the government alleges were made by defendant and his co-conspirators in furtherance of the conspiracy.  The government describes the evidence it seeks to admit, states the relevance of the evidence to the charged offenses, and sets forth the evidentiary grounds for its admission.  The government asserts the other acts evidence is admissible as direct evidence of, and is inextricably intertwined with, the charged conspiracy.  In the alternative, the government asserts that the evidence is admissible pursuant to Federal Rule of Evidence 404(b).

In opposition, Mr. Smothers contends primarily that the evidence the government seeks to admit is inadmissible propensity evidence and that the probative value of the evidence is far outweighed by the risk of unfair prejudice, jury confusion, and undue delay.  (*See* ECF No. 236, Smothers Opp. at

3

6-10; ECF No. 232, Smothers Mot. at 6; ECF No. 287, Smothers
Supp. Opp. at 12-20.)  Mr. Smothers also argues that the
government does not demonstrate a nexus between some of the
proffered evidence and Mr. Smothers.  (ECF No. 236, Smothers
Opp. at 10-11.)  Finally, Mr. Smothers argues that certain co-
conspirator statements are inadmissible hearsay.  (*Id*. at 11-
13.)

**DISCUSSION**

I.   **Legal Standard**

The Indictment charges Mr. Smothers with racketeering
conspiracy (Count I) and possessing a firearm during a drug
trafficking crime, to wit: the crime charged in Count One (Count
II).  With respect to Count I, the government must prove the
existence of an enterprise; that the enterprise had an effect on
interstate commerce; that Mr. Smothers was associated with or
employed by the enterprise, and that he agreed to engage in a
pattern of racketeering activity.  *See* 18 U.S.C. § 1962(c) and
(d).

A. **Direct Evidence of and Evidence that is Inextricably
Intertwined with the Enterprise and Conspiracy**

When a defendant has been charged with racketeering
offenses, it is well settled that "the government may introduce
evidence of uncharged offenses to establish the existence of the
criminal enterprise." *United States v. Baez*, 349 F.3d 90, 93

(2d Cir. 2003).  As the Second Circuit explained in *United States v. Mejia*, 545 F.3d 179, 206-07 (2d Cir. 2008):

> Where . . . the existence of a racketeering enterprise is at issue, evidence of uncharged crimes committed by members of that enterprise, including evidence of uncharged crimes committed by the defendants themselves, is admissible "to prove an essential element of the RICO crimes charged—the existence of a criminal enterprise in which the defendants participated." *Matera,* 489 F.3d 115, 120 (2d Cir. 2007) (upholding admission of evidence of uncharged murders).

The *Mejia* court also found that evidence of uncharged crimes was "admissible to show the existence of the conspiracy" with which the defendants were charged.  *Id.*  Evidence of uncharged acts is also admissible to prove the "nature of the RICO enterprise" and "a pattern of racketeering activity on the part of each defendant by providing the requisite relationship and continuity of illegal activities."  *United States v. Basciano*, 599 F.3d 184, 207 (2d Cir. 2010).  The Second Circuit explained in *Basciano* that:

> [A] defendant charged with substantive racketeering may not be accountable for the racketeering acts of others, but such acts can constitute some evidence of the nature of the enterprise, which, in turn, can prove the relatedness and continuity essential to a pattern, thereby helping to establish that the defendant's own acts constitute a pattern within the meaning of RICO.  Thus, while the district court correctly observed that the predicate acts attributed to Basciano's co-defendants in Count One of [the indictment] cannot provide the two predicates necessary to

5

> convict Basciano of the substantive RICO
> charge, it erred in concluding that predicate
> acts charged to co-defendants do nothing to
> establish the RICO charge against Basciano.

(internal quotations and citations omitted).  *Id.* at 206-207.

Additionally, it is also well established in the Second Circuit that where an indictment charges a defendant with a conspiracy charge, "[a]n act that is alleged to have been done in furtherance of the alleged conspiracy" is considered "part of the very act charged." *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) (internal quotation marks and alterations omitted); *see also United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994) (noting that in conspiracy cases, "uncharged acts may be admissible as direct evidence of the conspiracy itself").

Evidence of uncharged criminal conduct or other bad acts is relevant and not considered "other crimes" evidence under Rule 404(b) if the uncharged conduct "arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Gonzalez*, 110 F.3d 936, 941-42 (2d Cir. 1997) (internal quotations omitted) (emphasis added); *see also United States v. Khan*, 591 F. Supp. 2d 202, 205 (E.D.N.Y. 2008) (same); *United States v. Nektalov*, 325 F. Supp. 2d 367, 370 (S.D.N.Y. 2004) (same).  On

this basis, "the trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the Indictment. Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *Gonzalez,* 110 F.3d at 941; *see also United States v. Inserra,* 34 F.3d 83, 89 (2d Cir. 1994) (evidence of other bad acts may be admitted "to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense"). In racketeering and racketeering conspiracy cases in particular, this rule has been applied repeatedly to admit evidence of prior acts "to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." *Diaz,* 176 F.3d at 79.

Although evidence may be relevant as directly probative of, or inextricably intertwined with, the defendant's charged conduct, this evidence may nonetheless be inadmissible pursuant to Federal Rule of Evidence 403 ("Rule 403") if "its probative value is substantially outweighed by a danger of . . . unfair prejudice."  Fed. R. Evid. 403; *see also United States v.*

*Bourne,* No. 08-CR-888, 2011 WL 4458846, at *12 (E.D.N.Y. Sept. 23, 2011) ("Evidence of uncharged acts may be admissible, subject to limitations imposed by Rule[ ] 403 . . . ."). "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States,* 519 U.S. 172, 180 (1997). To determine whether evidence is unfairly prejudicial, the court considers it in the context of the crime alleged. Evidence shall be excluded as unfairly prejudicial when it is "more inflammatory than the charged crime." *United States v. Livoti,* 196 F.3d 322, 326 (2d Cir. 1999); *cf. United States v. Pitre,* 960 F.2d 1112, 1120 (2d Cir. 1992) (finding no unfair prejudice where "evidence of prior narcotics transactions 'did not involve conduct any more sensational or disturbing than the crimes with which [the appellants were] charged'") (quoting *United States v. Roldan-Zapata,* 916 F.2d 795, 804 (2d Cir. 1990)).

## B. Federal Rule of Evidence 404(b)

Federal Rule of Evidence 404(b) provides that:

Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan,

> knowledge, identity, absence of mistake, or
> lack of accident.

A district court exercising its discretion under Rule 404(b) must find that evidence of a prior crime, wrong, or other act is "(1) offered for a proper purpose, (2) relevant, and (3) substantially more probative than prejudicial.  In addition . . . at the defendant's request, the district court should give the jury an appropriate limiting instruction." *United States v. Downing*, 297 F.3d 52, 58 (2d Cir. 2002) (citing *Huddleston v. United States*, 485 U.S. 681, 691–92 (1988)).

Under the Second Circuit's "inclusionary approach to evaluating Rule 404(b) evidence," *United States v. Edwards*, 342 F.3d 168, 176 (2d Cir. 2003), "uncharged bad acts may be admitted into evidence for any relevant purpose other than propensity, provided that the probative value of the evidence outweighs the danger of unfair prejudice." *United States v. Graziano*, 391 F. App'x 965, 966 (2d Cir. 2010).  District courts should not, however, assume the relevance or admissibility of evidence under Rule 404(b) just because the evidence serves some purpose other than showing the defendant's bad character.  *See United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011).  "'[Other] act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant

was the actor.'"  *United States v. LaFlam*, 369 F.3d 153, 157 (2d Cir. 2004) (quoting *Huddleston*, 485 U.S. at 689).

If the evidence is relevant, the court must assess its potential for unfair prejudice.  The probative value of the evidence "depends largely on whether or not there is a close parallel between the crime charged and the acts shown." *United States v. Gordon,* 987 F.2d 902, 908 (2d Cir. 1993) (internal quotation marks omitted).  "The prejudicial effect may be created by the tendency of the evidence to prove some adverse fact not properly in issue or unfairly to excite emotions against the defendant."  *United States v. Figueroa,* 618 F.2d 934, 943 (2d Cir. 1980).  The district court abuses its discretion when it admits "other act" evidence with a high possibility of jury misuse but with only slightly more probative value than other evidence on the same issue.  *Curley*, 639 F.3d at 57.

## II.  The Government's Motions *in Limine*

The court addresses each category of evidence that the government seeks to introduce as direct evidence of Mr. Smothers' charged conduct, and Mr. Smothers' objections thereto.

### A. The Inception of E.A.M. and Mr. Smothers' Prior Gang Affiliations and Criminal Activities

The government seeks to introduce evidence regarding the inception of E.A.M.  Specifically, the government expects

10

CW-1 to testify about the founding and evolution of the gang now known as E.A.M., the history of Mr. Smothers' membership in E.A.M., and his relationship and criminal associations with other E.A.M. members that engaged in criminal activity.  (ECF No. 231, Gov't Mot. at 14-15.)  The government also seeks to introduce testimony from CW-1 that many of the individuals who currently identify themselves as members and associates of E.A.M. previously identified themselves as members of other subsets of the Bloods gang and knew each other through their prior Bloods affiliation.  CW-1 is also expected to testify to the following:  (1) that he first became a Bloods gang member by being recruited to a Bloods subset called "Mad Dog Bloods;" (2) CW-1 met Mr. Smothers because he was also a member of the Mad Dog Bloods set at the time CW-1 joined the gang; (3) the creation of another Blood set called "M.A.P." comprised of younger Bloods members who lived and operated in East New York, including CW-1, co-defendant Qawon Allen, and Individual-1; (4) that CW-1 later joined E.A.M., another offshoot of the Bloods street gang created in approximately 2006, and that the membership remained largely the same as the prior Blood sets and included Mr. Smothers and co-defendants Corbett, Allen, Individual-1, and another individual whom the government expects to testify at trial (CW-2).  (*Id*. at 14.)  Finally, the government expects CW-1 to testify that during his time as a

member of E.A.M. and prior Blood sets, he and other E.A.M.
members, including Mr. Smothers, sold drugs to make money and
engaged in violent confrontations — often involving firearms —
with rival crews.  (*Id*. at 15.)  Mr. Smothers argues that "the
evidence regarding the inception of E.A.M. and Mr. Smothers'
prior gang affiliation and activities should be precluded on the
ground of unfair and overwhelming prejudice, which would
contribute to improper conviction by virtue of guilt by
association alone."  (ECF No. 236, Smothers Opp. at 13-14.)

        The court finds that evidence of the inception of
E.A.M. and Mr. Smothers' prior gang affiliations and criminal
activities is admissible as direct evidence of the existence and
nature of the enterprise, and as direct evidence of Mr.
Smothers' charged firearm offense.  Evidence regarding a
criminal organization's founding is "classic enterprise
evidence," and has significant probative value to prove the
existence of the alleged conspiracy, as well as "to show its
background and history."  *See United States v. Ashburn*, 2015 WL
588704, at *12-13 (E.D.N.Y. Feb. 11, 2015) ("[T]he purpose of
CW-1's testimony is to establish the background and structure of
the conspiracy charged in this case, and to explain Ashburn's
leadership role and the basis for mutual trust among
conspirators.") (citing *United States v. Diaz*, 176 F.3d 52, 79-
80 (2d Cir. 1999)).

Further, the Indictment specifically alleges that Mr. Smothers engaged in drug trafficking and "did knowingly and intentionally use and carry one or more firearms during and in relation to a drug trafficking crime." (Indictment at 5-6.) Thus, testimonial evidence from CW-1 that he and other E.A.M. members, including Mr. Smothers, "sold drugs to make money and engaged in violent confrontations — often involving firearms — with rival crews" provides "relevant historical background to the development of the geographic scope" of the E.A.M. organization and its alleged drug trafficking activities, and explains Mr. Smothers' relationship with members and associates of E.A.M. *See United States v. Rivera*, No. 13-CR-149 (KAM), 2015 WL 1875658, at *5 (E.D.N.Y. Apr. 22, 2015) (admitting evidence of defendants' drug trafficking activities with enterprise members prior to the start of the alleged conspiracy period); *see also United States v. Guerrero,* 882 F. Supp. 2d 463, 492 (S.D.N.Y. 2011), *aff'd*, 560 F. App'x 110 (2d Cir. 2014) (summary order) (holding that "evidence related to the defendants' prior illicit transactions with their co-conspirators" including shootings of drug rivals, possession of guns belonging collectively to the organization, and robberies of drug customers was "plainly admissible to explain the development of the illegal relationship between the defendants and their co-conspirators and explain [sic] he mutual trust that

13

existed between the coconspirators (including the cooperating Government Witnesses)"); *cf., United States v. Mitchell*, 328 F.3d 77, 83 (2d Cir. 2010) ("[O]ur circuit has long recognized the connection between drug trafficking and firearms, repeatedly permitting firearms into evidence as proof of narcotics conspiracies because drug dealers commonly keep firearms on their premises as tools of the trade.") (internal quotations and citation omitted).

Finally, the court finds that the significant probative value of this evidence is not substantially outweighed by the risk of unfair prejudice as Mr. Smothers argues.  The charges against Mr. Smothers in the Indictment include a conspiracy consisting of, *inter alia*, "multiple acts involving murder."  Consequently, the proffered evidence here is no more sensational, disturbing, or inflammatory than those charged crimes.  *See United States v. Livoti,* 196 F.3d 322, 326 (2d Cir. 1999); *United States v. Pitre,* 960 F.2d 1112, 1120 (2d Cir. 1992) (finding no unfair prejudice where "evidence of prior narcotics transactions 'did not involve conduct any more sensational or disturbing than the crimes with which [the appellants were] charged'") (quoting *United States v. Roldan-Zapata,* 916 F.2d 795, 804 (2d Cir. 1990)).

14

**B. The Enterprise: E.A.M.**

The government seeks to introduce testimony, in substance and in part, from statements by the defendant or alleged co-conspirators, during and in furtherance of the charged and uncharged conspiracy, via one or more cooperating witnesses who were members of E.A.M., about E.A.M.'s organizational structure and hierarchy, including Mr. Smothers' alleged membership; the rules of the organization by which E.A.M. had to abide; and the criminal methods utilized by E.A.M. members to financially support and contribute to the alleged E.A.M. enterprise.  (ECF No. 231, Gov't Mot. at 8; ECF No. 275, Gov't Supp. Mot. at 15.)   For example, the government expects at least one cooperating witness to testify that, in or about 2018, Mr. Smothers served as a "godfather" of the organization — i.e., the highest — ranking individual in E.A.M.  (ECF No. 231, Gov't Mot. at 8.)   The government also expects one or more witnesses to testify that although Mr. Smothers was the head of E.A.M., at a certain point Mr. Smothers "tried to take leadership over all of the New York Bloods nation from its then-leader."  (ECF No. 275, Gov't Supp. Mot. at 19.)

The cooperating witnesses are also expected to testify to the following:

- Members of the enterprise were expected to swear loyalty to E.A.M. members and wage violence against perceived

"enemies" of the enterprise, such as reciting the "E.A.M. OATH," which was found on an E.A.M. member's phone, and which reads in part: "To be elite assassin milla one must know what one does affects us all so to be elite one must move discreet."

- Members were also required to recite the "21 second oath and pledge," which was also found on an E.A.M. member's phone, and which reads in part: "It take 21 seconds, 2 be blood, being blood is about respecting your family and doing what you could, learning 2 love and trust your brothers and sisters while protecting ur hood, left over my heart is how I be, then it's death 2 my enemies. I take this oath in total devotion and dedication, representing ride or die, or its death that I'm facing. . . . East be the way by milla I stay . . . ."

  - The government contends that by taking this oath, members of E.A.M. were expected to vow loyalty to their fellow gang members (i.e., "representing ride or die") and be willing to kill those who threaten or disrespect a fellow gang member (i.e., "being blood is about respecting your family . . . while protecting ur hood . . . then it's death 2 my enemies.").

16

- E.A.M. also held large meetings at which E.A.M. members
  were expected to contribute money to the "kitty" — the
  E.A.M. enterprise's communal finances. Specifically, the
  money in the "kitty" was intended to provide financial
  support for incarcerated and newly released Enterprise
  members, as well as to finance Enterprise-related
  gatherings.

(ECF No. 231, Gov't Mot. at 8-9.)

The court finds that evidence about E.A.M.'s
organizational structure and hierarchy; the rules of the
organization by which E.A.M. had to abide; and the criminal
methods utilized by E.A.M. members to financially support and
contribute to the E.A.M. enterprise is admissible as direct
evidence, as it has significant probative value to the very
existence and maintenance of the E.A.M. enterprise and that Mr.
Smothers was allegedly associated with or employed by the
enterprise, both elements which the government must prove as to
Count I. *See* 18 U.S.C. § 1962(c)-(d).

### C. Acts Committed Pursuant to the Conspiracy

#### 1. Non-Fatal Shooting of Individual-1 in 2011

The government alleges that on or about April 30,
2011, Mr. Smothers shot Individual-1 (allegedly a fellow E.A.M.
member) multiple times in the body, including the groin, arm,
leg, and shoulder, in Brooklyn, leaving Individual-1 permanently

17

disabled.  (ECF No. 231, Gov't Mot. at 10.)  The government

contends that evidence at trial will demonstrate that Mr.

Smothers shot Individual-1 to protect a fellow member of E.A.M.

The government further alleges that evidence will prove the

following:

> Prior to the shooting, Individual-1 had been
> hanging out with a drug-trafficking crew that
> operated on the Fulton Street side of East New
> York.  An E.A.M. member ("Individual-2") later
> robbed a member of the Fulton Street crew.
> The Fulton Street crew then sent Individual-1
> to shoot Individual-2.  When Individual-1 came
> looking for Individual-2, Mr. Smothers shot
> Individual-1.

(*Id.*)

### a. Evidence of Individual-1's Prior Identifications

The government seeks to introduce the following

evidence: (1) testimony from Individual-1 that he previously

identified the defendant as the shooter on April 30, 2011 at the

scene of the shooting and later at the hospital; (2) testimony

of the NYPD detective who was present for Individual-1's

statement at the scene of the shooting that identified "Chucky"

(i.e., Mr. Smothers) as the shooter; (3) testimony of another

NYPD detective who was present for Individual-1's statement on

April 30, 2011 in the ambulance that "Chucky" shot him, and at

the hospital that "Quandel Smother [sic] shot me"; (4)

Individual-1's May 9, 2011 photo identification of "Chucky" in a

six-pack photo array, administered by another NYPD Detective;

18

Case 1:20-cr-00213-KAM  Document 296  Filed 01/20/23  Page 19 of 68 PageID #: 3294

(5) the photo array itself, which was signed by Individual-1;

and (6) Individual-1's prior state grand jury testimony in which

he identified the defendant as the shooter.  (ECF No. 275, Gov't

Supp. Mot. at 22.)

### i. *Direct Evidence of and Evidence that is Inextricably Intertwined with the Enterprise and Conspiracy*

The government argues that proof that Mr. Smothers

shot Individual-1 to protect a fellow E.A.M. member is

admissible as direct proof to show the existence and nature of

the alleged racketeering enterprise.  (ECF No. 231, Gov't Mot.

at 28.)  Mr. Smothers generally argues that evidence of his

prior gang affiliation and activities "should be precluded on

the ground of unfair and overwhelming prejudice, which would

contribute to improper conviction by virtue of guilt by

association alone," per Rule 404(b) and Rule 403. (ECF No. 36,

Smothers Opp. at 13.)  Mr. Smothers also argues that "nearly

all" of the government's proffered evidence of other crimes,

wrongs, or acts (i.e., Rule 404(b) evidence) is cumulative,

prejudicial, or irrelevant to Mr. Smothers' charged offenses.

(*Id.* at 5; ECF 287, Smothers Supp. Opp. at 14); *see* Rule 404(b).

The court finds that evidence of the 2011 shooting of

Individual-1 (who is expected to testify at trial) including

Individual-1's prior identifications of Mr. Smothers as the

shooter, is admissible as direct evidence of the existence and

nature of a criminal enterprise in which Mr. Smothers allegedly participated, and as direct evidence of the pattern of racketeering activity. *See United States v. Matera*, 489 F.3d 115, 120 (2d Cir. 2007) (upholding the district court's admission of evidence of murders committed by both defendant and non-defendants because the evidence "was offered to prove an essential element of the RICO crimes charged — the existence of a criminal enterprise in which the defendants participated"); *United States v. Basciano*, 599 F.3d 184, 207 (2d Cir. 2010) (holding that "the racketeering acts of others . . . can constitute some evidence of the nature of the enterprise, which, in turn, can prove the relatedness and continuity essential to a pattern, thereby helping to establish that the defendant's own acts constitute a pattern within the meaning of RICO") (internal quotations and citation omitted). As the government plans to introduce testimony of cooperating witnesses describing how members of the enterprise were "expected to swear loyalty to E.A.M. members and wage violence against perceived "enemies" of the enterprise," *supra*, Section II.B, evidence that Mr. Smothers allegedly shot an individual to protect a fellow E.A.M. member directly reflects his adherence to the underlying loyalty oath of the enterprise's members. *See, e.g., United States v. Miller*, 116 F.3d 641, 682 (2d Cir. 1997) (holding that "evidence of numerous killings" by enterprise members was introduced not

20

as "other" acts under Rule 404(b), but as "proof of the existence of the RICO enterprise alleged in the indictment which used such acts of violence in furtherance of its narcotics conspiracy"); *see also Matera*, 489 F.3d at 120.

### ii. *Rule 801(d)(1)(C)*

Under Federal Rule of Evidence 801(d)(1)(C), a statement that "identifies a person as someone the declarant perceived earlier" is not hearsay provided that the declarant testifies and is subject to cross-examination.  Rule 801(d)(1)(C) should be "interpreted as allowing evidence of prior identification by the witness of a photograph of the person whom he had initially perceived . . . and also to descriptions and sketches."  *United States v. Marchand*, 564 F.2d 983, 996 (2d Cir. 1977).  Further, a prior identification will be excluded "only if it was produced through an unnecessarily suggestive procedure and unreliable."  *United States v. Bautista*, 23 F.3d 726, 729 (2d Cir. 1994); *see also United States v. Simmons*, 923 F.2d 934, 950 (2d Cir. 1991).  Mr. Smothers argues that admitting testimony from the NYPD detective present at the scene of the shooting and from the NYPD detective who was in the ambulance after the shooting would be "nothing beyond bolstering and proffering hearsay."  (ECF No. 287, Smothers Supp. Opp. at 2.)  Mr. Smothers also argues that, in order to guarantee Mr. Smothers' due process of law, the court

21

should conduct a pre-trial hearing to ascertain whether or not
"the prior identification procedures were unduly suggestive and
conducive to irreparable mistaken identification."   (*Id.* at 3.)
Mr. Smothers also argues that Individual-1's photo
identification is testimonial hearsay under *Crawford v.
Washington*, and thus, its introduction is barred under the Sixth
Amendment's Confrontation Clause unless Individual-1 is subject
to cross-examination concerning this identification.  (*Id.* at
5); *see also Crawford v. Washington*, 541 U.S. 36 (2004).

     The court respectfully disagrees with Mr. Smothers'
contentions.  First, the government represents that Individual-1
is anticipated to testify at trial and, therefore, Individual-1
would be subject to cross-examination.  (ECF No. 275, Gov't
Supp. Mot. at 21.)  As such, Individual-1's prior
identifications of Mr. Smothers as the person who shot him are
admissible pursuant to Rule 801(d)(1)(C).  Nor is Individual-1's
May 9, 2011 identification from the six-pack photo array barred
by the Confrontation Clause.  Individual-1 will not be an
"unavailable witness," as he will be subject to cross-
examination regarding the prior identifications, including the
photo array.  Second, the court, exercising its discretion, does
not find it necessary to grant an evidentiary hearing to assess
the suggestiveness of identification procedures used, for
reasons stated below.  *See United States v. Wade*, 388 U.S. 218

(1967); *Watkins v. Sowders*, 449 U.S. 341, 345 (1981) (noting that "the prudence" of a trial court holding a hearing out of the presence of the jury to determine the admissibility of identification evidence "has been emphasized by many decisions in the Courts of Appeals"); *see also United States v. Bracy*, 2022 WL 17801133, at \*2 (E.D.N.Y. Dec. 19, 2022).

Here, even Individual-1's in-court identification of Mr. Smothers would be independently reliable because Mr. Smothers was already known to Individual-1 prior to the six-pack photo array.  The government represents that Individual-1 was not only an E.A.M. member, but that Individual-1 also "grew up with" Mr. Smothers and "had known [Mr. Smothers] for about ten years" prior to the shooting.  (ECF No. 275, Gov't Supp. Mot. at 10; ECF No. 289, Gov't Supp. Reply at 5-6); *see also Bracy*, 2022 WL 17801133, at \*3 (although recognizing that the defendant is not in a position to know about improprieties in the identification procedure, determining that a *Wade* hearing was particularly unnecessary because, even if the pretrial identification procedures were unduly suggestive, the victim's in-court identification of the defendant would be independently reliable due to the preexisting familiarity of the two men."); *see also Johnson v. Walker*, 2003 WL 22002420, at \*9 (E.D.N.Y. Aug. 25, 2003) ("[T]he fact that petitioner was known to the eyewitness and was not a stranger is itself compelling evidence

of an independent source for the identification."); *cf. United States v. Nieves*, 2021 WL 1240472, at *3 (S.D.N.Y. Apr. 1, 2021) (noting that "courts in this circuit have held that identification procedures consisting of the display of a single photograph to a witness who states that the witness already knows the perpetrator, in order to confirm the perpetrator's identity, are not unduly suggestive") (internal quotations and citation omitted).  Further, Individual-1 made multiple consistent, prior identifications of Mr. Smothers by name, even prior to the administration of the six-pack photo array — on April 30, 2011 at the scene of the shooting, the subsequent ambulance ride, and later at the hospital.  *See Bracy*, 2022 WL 17801133, at *3 ("The government represents the [victim of the shooting] identified [the defendant] by name before being shown the photo array.").

As the government acknowledges, Individual-1's grand jury testimony and his photo array identification will not be admissible if Individual-1 does not testify at trial.  The court also preliminarily finds, without prejudice for the government to proffer additional facts at trial, that Individual-1's identification of Mr. Smothers in the hospital to the NYPD officer is "testimonial" evidence that would be inadmissible if Individual-1 does not testify at trial.  The government states: "[A] short time [after the ambulance ride], hospital staff

alerted a member of the [NYPD] that the shooting victim had called out the name of the person who shot him; when the NYPD officer when into the room, Individual-1 told him, 'Quandel Smothers shot me,' and provided information about where the defendant resided." (ECF No. 275, Gov't Supp. Mot. at 10.). The context of hospital staff alerting law enforcement that Individual-1 had called out the name of the person who shot him arguably indicates that the primary purpose of the law enforcement officer entering Individual-1's hospital room was to "establish or prove past events potentially relevant to later criminal prosecution." *See Davis v. Washington*, 547 U.S. 813, 822 (2006). Further, the government represents that Individual-1 "provided information about where the defendant resided" to the NYPD officer. Information regarding an alleged perpetrator's residence would appear to be information offered to law enforcement to aid a subsequent investigation, rather than to "enable police assistance to meet an ongoing emergency." *See Davis*, 547 U.S. at 814.

The court finds that Individual-1's identification of Mr. Smothers in the ambulance would be admissible as an excited utterance per Rule 803(2), and not barred by the Confrontation Clause as testimonial evidence. *See United States v. Martinez,* 311 F. App'x 378, 380 (2d Cir. 2008) (summary order) (holding that district court did not err in admitting statement made by a

witness, who did not testify at trial, identifying defendant as
shooter where the statement was made shortly after the shooting
while the witness was receiving medical attention).

> **b. 9-1-1 Calls Placed Immediately After the Alleged
> Shooting of Individual-1; Statements on 9-1-1 Calls;
> Prehospital Care Report**

The government seeks to introduce certain 9-1-1 calls
placed immediately after the shooting of Individual-1 and the
"FDNY Prehospital Care Report" prepared in the aftermath of the
shooting.  (ECF No. 275, Gov't Supp. Mot. at 23, 61.)   The
government's introduction of 9-1-1 calls includes statements
made by Individual-1, another speaker, and a second caller
during the 9-1-1 calls.  (*Id.* at 25-26.)   The government argues
the 9-1-1 calls and the report are highly probative of the
charged conduct.  (*Id.*)

> ### *i. Admissibility*

The court finds that the recordings of the 9-1-1 calls
and the prehospital care report are admissible as "business
records" per Fed. R. Evid. 803(6), provided that at trial the
government lays the proper foundation for the calls' and
report's admission into evidence.

Per FRE 803(6), business records are not excluded by
hearsay if:

> **(A)** the record was made at or near the time by — or from
> information transmitted by — someone with knowledge;

**(B)** the record was kept in the course of a regularly

conducted activity of a business, organization, occupation,

or calling, whether or not for profit;

**(C)** making the record was a regular practice of that

activity;

**(D)** all these conditions are shown by the testimony of the

custodian or another qualified witness, or by a

certification that complies with Rule 902(11) or (12) or

with a statute permitting certification; and

**(E)** the opponent does not show that the source of

information or the method or circumstances of preparation

indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).

First, 9-1-1 calls are "regularly admitted into the

evidence as business records." *United States v. Yuan Li*, 2020

WL 6393038, at *12 (E.D.N.Y. Nov. 2, 2020); *see also United

States v. Chen Kuo*, 2011 WL 145471, at *11 (collecting cases).

Second, the pre-hospital care report was made at or near the

time of the shooting by someone with knowledge, namely, the

emergency medical personnel on site.  Third, making such a

report is a regular practice of emergency medical personnel.

The report itself bears an FDNY stamp that reads: "FIRE

DEPARTMENT — CITY OF NEW YORK. I hereby certify pursuant to CPLR

2306 and 2307 that this document is a true and accurate copy of

a Fire Department record kept in the regular course of Fire Department business."  (ECF No. 275, Gov't Supp. Mot. at 61.) The report also includes the date, address of the shooting, a description of the incident ("shot multiple times") and the statement "I got shot." by Individual-1.  (*Id*. at 61-62.) Finally, Mr. Smothers has not suggested that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness; nor is there some separate indicia of unreliability that the court would find troubling. Accordingly, the recordings of the 9-1-1 calls and the FDNY prehospital care report are "business records" under Rule 803(6) and not excluded by the general prohibition on hearsay.

The court also finds that the statements are admissible as either present sense impressions under Fed. R. Evid. 803(1), or as excited utterances under Fed. R. Evid. 803(2).  Under Rule 803(1), a "statement describing or explaining an event or condition, made while or immediately after the declarant perceived it" is not excluded by the rule against hearsay.  Rule 803(1) thus has three distinct requirements: (a) the statement must describe or explain the event perceived; (b) the declarant must have in fact perceived the event described; and (c) the description must be "substantially contemporaneous" with the event in question.  *See United States v. Mejia-Valez*, 855 F.Supp. 607, 613 (E.D.N.Y.

1994).  Here, the statements on both 9-1-1 calls (Gov't Supp.
Mot., Ex. A, Ex. B) all describe the event perceived, namely,
that Individual-1 had been shot and was in need of emergency
help; the speakers (Individual-1 and the "Unidentified Speaker"
in Ex. A, and "Speaker 1" in Ex. B) all clearly perceived that
Individual-1 had been shot and needed medical assistance; and
the statements on the 9-1-1 calls were made soon after
Individual-1 had been shot.  The government represents that
"Individual-1 reported that he was shot immediately after it
happened" and that "testimony at trial will establish that it
was because of the 9-1-1 caller that law enforcement and medical
personnel responded to the scene."  (ECF No. 275, Gov't Supp.
Mot. at 27.)  Accordingly, the statements on the 9-1-1 calls are
admissible pursuant to the present sense impression hearsay
exception.

Under Rule 803(2), a "statement relating to a
startling event or condition, made while the declarant was under
the stress of excitement that it caused," is not hearsay and is
admissible.  For the "excited utterance" hearsay exception to
apply, the proponent of the statement must establish (1) that a
startling event occurred; (2) that the declarant made the
statement while under the stress of the excitement caused by the
startling event; and (3) that the declarant's statement relates
to the startling event.  *See United States v. Brown*, 254 F.3d

454, 458 (2d Cir. 2001).  Here, a shooting of Individual-1 and the immediate aftermath thereof would obviously be a startling event.  As stated above, the declarants on the 9-1-1 calls clearly made the out-of-court statements in the immediate aftermath of Individual-1 being shot, and their statements clearly relate to the shooting.  Such statements as: "He's fucking on the fucking floor shot," "Man, he's awake. He's awake right now," "Somebody just got shot on Ashford" demonstrate both that the statements were made under the stress of the excitement and that the statements themselves related to Individual-1 having been shot.  (ECF No. 275, Gov't Supp. Mot. at 51, 55.)

### ii. Sixth Amendment's Confrontation Clause

The Confrontation Clause of the Sixth Amendment prohibits the admission of out-of-courts statements that are testimonial unless the declarant is unavailable, and the defendant had a prior opportunity to cross-examine the declarant regarding the out-of-court statement.  *See Crawford v. Washington*, 541 U.S. 36, 59 (2004).  The court finds that the 9-1-1 calls, the statements therein, and the prehospital care report are not testimonial evidence that would be inadmissible under the Sixth Amendment's Confrontation Clause.

As the Supreme Court recognized in both *Davis v. Washington*, and *Michigan v. Bryant*, "a conversation which begins as an interrogation to determine the need for emergency

30

assistance" can "evolve into testimonial statements." *See Davis v. Washington*, 547 U.S. 813, 828 (2006); *Michigan v. Bryant*, 562 U.S. 344, 365 (2011). *Bryant*, however, also noted that examples of such evolution may include, e.g., a circumstance where "a declarant provides police with information that makes clear that what appeared to be an emergency is not or is no longer an emergency or that what appeared to be a public threat is actually a private dispute." *Bryant*, 562 U.S. at 365. Here, the 9-1-1 calls are not analogous to such evolution into testimonial evidence — the calls make clear that there was an ongoing emergency, e.g., Individual-1 needed emergency medical support after being shot. *See Davis*, 547 U.S. at 827 ("A 911 call, on the other hand, and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to establish or prove some past fact, but to describe current circumstances requiring police assistance.") (internal quotations and citation omitted). Similarly, the prehospital care report is not testimonial evidence because, as the name states, the report's primary purpose was to provide emergency medical care for Individual-1 following the shooting. This is further evidenced by information in the report such as a summary of injuries, and medical information regarding Individual-1's pulse, pain levels, and assessing Individual-1's

31

breathing.  (ECF No. 275, Gov't Supp. Mot. at 61); *see Davis*, 547 U.S. at 822 (2006).

### c. Rule 403

The court also finds that the significant probative value of the evidence related to the shooting of Individual-1 is not substantially outweighed by the risk of unfair prejudice under Rule 403 because, under the Second Circuit's standard in *Livoti*, the evidence is no more inflammatory than the offenses with which Mr. Smothers is charged.  *See also United States v. Bourne,* No. 08-CR-888, 2011 WL 4458846, at *15 (E.D.N.Y. Sept. 23, 2011) (noting that while the alleged assault was "serious," it was "no more inflammatory than the charged conduct"); *see also United States v. Rivera*, No. 13-CR-149 (KAM), 2015 WL 1875658, at *8 (E.D.N.Y. Apr. 22, 2015).  Evidence of the 2011 shooting of Individual-1 is no more inflammatory than the predicate acts alleged in the Indictment, which alleges "multiple acts of murder" as part of the "conduct of the affairs of the enterprise."  (Indictment at 5.)

### 2. Fatal Shooting of Michael Tenorio in April 2015; March 7, 2016 and June 28, 2018 Shootings of John Doe #1

The government and Mr. Smothers simultaneously address (1) the Fatal Shooting of Michael Tenorio in April 2015 and (2) the March 7, 2016 and June 28, 2018 Shootings of John Doe #1, and the court will address both here.

32

a. **Direct Evidence of and Evidence that is Inextricably Intertwined with the Enterprise and Conspiracy**

The government seeks to introduce evidence that a co-conspirator of Mr. Smothers shot and killed Michael Tenorio (also known as "Nitty") in East New York, Brooklyn, on April 21, 2015.  (ECF No. 231, Gov't Mot. at 10-11.)  The government alleges that Tenorio's murder was "retaliation for the murder of fellow E.A.M. member Jonathan Thomas, also known as 'OG Black' ('Thomas')."  The government expects to prove that Thomas was a beloved member of E.A.M., and that some members of E.A.M. believed that Tenorio (at the direction of John Doe #1) had murdered Thomas and E.A.M. sought revenge by fatally shooting Tenorio.  (*Id.* at 11.)

The government also seeks to introduce evidence at trial that proves that "E.A.M. members and associates sought to kill John Doe #1 because they believed John Doe #1 had directed Tenorio to kill Thomas."  (*Id.*)  The government specifically proffers the following: (1) that on March 7, 2016, co-defendant Tyshawn Corbett shot John Doe #1 in the back from close range, in front of John Doe #1's residence in Brooklyn, and that John Doe #1 survived the shooting, which upset Mr. Corbett; (2) that after the failed shooting, Mr. Corbett conspired with other E.A.M. members and associates, including Marlon Bristol, Devon Bristol, and Desmonn Beckett, to locate and kill John Doe #1

33

again; (3) that Mr. Corbett's text communications will show that
he and his co-conspirators tracked John Doe #1's whereabouts by
conducting physical surveillance and installing a tracking
device on John Doe #1's car; (4) that, on June 28, 2018, after
locating John Doe #1's car using the tracking device, Mr.
Corbett approached John Doe #1 on the driver's side window and
shot him at close range.  John Doe #1 survived the shooting, but
is now a paraplegic.  (*Id.* at 11.)

       Mr. Smothers objects to the introduction of evidence
of these three shootings on the grounds that "the government
does not demonstrate a nexus with Mr. Smothers."  (ECF No. 236,
Smothers Opp. at 10.)  Mr. Smothers notes that "the government
even admits that Mr. Smothers himself is not alleged to have
participated" in the fatal shooting of Michael Tenorio, and that
likewise, "the government has failed to show any connection of
[the two shootings of John Doe #1] to Mr. Smothers."  (*Id.* at
10-11.).

       Evidence regarding the fatal shooting of Michael
Tenorio and of the two shootings of John Doe #1 is admissible as
direct evidence of the existence and nature of the racketeering
conspiracy, and of the pattern of racketeering activity on the
part of enterprise members and associates, including Mr.
Smothers.  The government does not have to prove that Mr.
Smothers himself committed or participated in the racketeering

34

acts at issue for Mr. Smothers to be found guilty of the RICO
conspiracy.  Under Second Circuit precedent, it is well-
established that "the agreement proscribed by section 1962(d) is
a conspiracy to participate in a charged enterprise's affairs
through a pattern of racketeering, not a conspiracy to commit
predicate acts." *See United States v. Pizzonia*, 577 F.3d 455,
463 (2d Cir. 2009) (citing *United States v. Persico*, 832 F.2d
705 (2d Cir. 1987) (internal quotations omitted)).

Further, proof of the RICO enterprise and of the
pattern of racketeering activity "may well entail evidence of
numerous criminal acts by a variety of persons."  *United States
v. DiNome*, 954 F.2d 839, 843 (2d Cir. 1992).  As the Second
Circuit formulated in *United States v. Basciano*:

> A single pattern of racketeering may be
> common to a number of defendants and, in
> such circumstances, **even though individual
> defendants "may reasonably claim no direct
> participation" in the acts of others,
> "evidence of those acts is relevant to the
> RICO charges against each defendant."** *Id.*
> Specifically, the "various criminal
> activities" of racketeering confederates are
> admissible against each defendant "to prove:
> (i) the existence and nature of the RICO
> enterprise and (ii) a pattern of
> racketeering activity on the part of each
> defendant by providing the requisite
> relationship and continuity of illegal
> activities."

599 F.3d 184, 207 (2d Cir. 2010) (emphasis added).

35

Here, even though Mr. Smothers may not have directly participated in the shootings of Michael Tenorio and John Doe #1, "a conspirator charged with racketeering conspiracy need not commit or even agree to commit the predicate acts that are elements of a substantive count to be found guilty of the racketeering conspiracy, for it suffices that he adopted the goal of furthering or facilitating the criminal endeavor." *See United States v. Ciccone*, 312 F.3d 535, 542 (2d Cir. 2002) (internal quotations and citations omitted).

b. **Rule 403**

Mr. Smothers contends that the introduction of evidence of the shootings of Mr. Tenorio and John Doe #1 "to prove that Mr. Smothers was associated to E.A.M., is too attenuated to be permissible under 403." (ECF No. 236, Smothers Opp. at 10-11.) Mr. Smothers also contends:

> Based on the discovery provided in this case, it appears that the shootings of Michael Tenorio and John Does # 1 and # 2 were investigated thoroughly at the time and that no charges were filed against Mr. Smothers. Any evidence of the shootings will do more harm in that it is cumulative evidence which would cause undue prejudice to Mr. Smothers. The jury can be confused by the evidence, they may assume Mr. Smothers did commit the crime. Its introduction will confuse the issues, mislead the jury, cause undue delay, waste of time, and would constitute cumulative evidence, therefore, any evidence of the shootings should be excluded[.]

36

(ECF No. 232, Smothers Mot. at 12.)

The court does not find that the probative value of the evidence is substantially outweighed by the risk of unfair prejudice or misleading the jury under Rule 403.

First, Count One clearly alleges "multiple acts of murder" as part of the "conduct of the affairs of the enterprise." (Indictment at 5.) Thus, evidence of these shootings is in line with some of the predicate acts alleged in the charged crime. *See Livoti*, 196 F.3d 322, 326 (2d Cir. 1999). Moreover, "[w]hen a defendant engages in a criminal enterprise which involves very serious crimes, there is a likelihood that evidence proving the existence of the enterprise through its acts will involve a considerable degree of prejudice. Nonetheless, the evidence may be of important probative value in proving the enterprise." *United States v. Mejia*, 545 F.3d 179, 207 (2d Cir. 2008). The court finds that the evidence is of important probative value here, where the existence and activities of the enterprise itself is one of the elements the government must prove as to Count One.

Second, Mr. Smothers also argues that the jury "may assume" that he "did commit the crime," but offers no basis for his argument. (ECF No. 232, Smothers Mot. at 12.) The government does not appear to dispute that Mr. Smothers did not commit the shootings of Mr. Tenorio and John Doe #1 himself.

37

Rather, as stated above, the government expects to prove at trial that Mr. Smothers was "also in agreement with this plan and continued to participate in E.A.M. knowing it would be, and ultimately was, acted upon." (ECF No. 237, Gov't Reply at 11.) Further, although Mr. Smothers argues that "a limiting instruction may not be sufficient to undo the prejudice," he does not specifically identify why a limiting instruction would be insufficient in this case, and does not propose one. (ECF No. 236, Smothers Opp. at 7.)  The parties may confer and propose a limiting instruction.

### 3. June 10, 2018 and July 28, 2018 Shooting of John Doe #2

The government seeks to introduce evidence related to two separate shootings of John Doe #2.

The government alleges that on June 10, 2018, co-defendant Corbett and John Doe #2 got into an argument, culminating with Corbett punching John Doe #2 and the two shooting at one another.  Following the shooting, John Doe #2 was arrested and sent to Rikers Island for his involvement in the shooting.  (ECF No. 231, Gov't Mot. at 11-12.)  The government further alleges that: (1) John Doe #2's feud with Corbett and other members of E.A.M. escalated over the next months following the first shooting involving Mr. Corbett and John Doe #2; (2) on June 16, 2018, CW-1 (an individual who is

38

expected to testify at trial) directed another E.A.M. member to assault John Doe #2 while both were incarcerated on Rikers Island (*id.* at 12.); (3) on or about June 28, 2018, after John Doe #2 was released from prison, John Doe #2 retaliated by shooting at a car, in which Mr. Smothers was seated.  (*Id.*)

The government expects CW-1 to testify to the following: (1) that after the June 28, 2018 shooting, members of E.A.M. were angry and expressed their intention to retaliate against John Doe #2, culminating in the July 28, 2018 shooting of John Doe #2 by CW-1; (2) that, on July 28, 2018, Qawon Allen (another E.A.M. member and co-defendant in this case) called CW-1 and told CW-1 that he had seen John Doe #2.  Allen gave CW-1 specific details about John Doe #2's location, the clothes he was wearing, and his direction of travel. Allen also told CW-1 where Allen had hidden a gun in Brooklyn so that CW-1 could find it and use it to shoot John Doe #2.  CW-1 subsequently went to retrieve the gun that Allen had hidden, and then traveled to the location where Allen had indicated John Doe #2 could be found. When CW-1 found John Doe #2, CW-1 repeatedly shot at John Doe #2; (3) that after the July 28, 2018 shooting of John Doe #2 by CW-1, CW-1 then fled the scene and threw the gun out of his car window.  CW-1 began panicking and called Mr. Smothers.  CW-1 subsequently met up with Messrs. Smothers and Corbett at a restaurant where they discussed the shooting of John Doe #2.  At

39

the meeting, Mr. Smothers allegedly stated that Mr. Allen, an E.A.M. member, had called Mr. Smothers before calling CW-1 so that Mr. Smothers could kill John Doe #2, but Mr. Smothers had not been nearby when Mr. Allen called him and was therefore unable to shoot John Doe #2 himself.

Mr. Smothers objects to the introduction of his alleged statements to CW-1 after the July 28, 2018 shooting, arguing that they do not qualify as co-conspirator statements under Rule 801(d)(2)(E).  Mr. Smothers also argues that the statements are "inadmissible hearsay because it was entirely retrospective" and because the alleged conversation between Mr. Smothers and CW-1 "took place after the shooting."  (ECF No. 236, Smothers Opp. at 12-13.)  The court does not reach the parties' Rule 801(d)(2)(E) arguments because Mr. Smothers' statements are clearly admissible as a relevant, opposing party statement under Rule 801(d)(2)(A).  Mr. Smothers' statements following the July 28, 2018 shooting are relevant to the charged offense and are being offered against him by the government, the opposing party.  As such, the statements are not hearsay under Federal Rule of Evidence 801 and are admissible.  The court further finds in its discretion that, under Rule 403, the probative value of this evidence is not substantially outweighed by the risk of unfair prejudice.

40

### 4. E.A.M.'s Drug Trafficking Operations

The government seeks to introduce "cooperating witness testimony and phone evidence" that for years, E.A.M. members enriched members of the enterprise by selling controlled substances in and around East New York, Brooklyn.  (ECF No. 231, Gov't Mot. at 13.)  Specifically, the government anticipates that CW-1's testimony will describe the means and methods by which E.A.M. ran its drug trafficking operations.  The government also expects that cooperating witness testimony and phone evidence will prove that Mr. Smothers was personally involved in the sale and distribution of marijuana and crack cocaine.  (ECF No. 275, Gov't Supp. Mot. at 18-19.)  For example, the government expects CW-1 to testify that he "intermittently acted as a middleman in marijuana transactions between the defendant and third-party customers."  (*Id.* at 18-19.)

Further, the government intends to introduce evidence that E.A.M. routinely purchased and distributed firearms to its members for communal use in furtherance of their narcotics distribution activities, specifically to protect themselves and their distribution territories.  (ECF No. 231, Gov't Mot. at 13.) For example, CW-1 is expected to testify to the following: that while he was selling crack cocaine in Brooklyn, CW-1 was confronted by a man with a gun who told CW-1 that CW-1 could not

41

sell drugs on that block.  In response, CW-1 retrieved a gun and fired shots in the direction of the man's crack cocaine spot, although he did not strike anyone.  (*Id.*; ECF No. 275, Gov't Supp. Mot. at 19.)

The government argues that evidence of E.A.M.'s drug trafficking operation is direct evidence of, and inextricably intertwined with, the charged offenses, specifically how Mr. Smothers, allegedly as an E.A.M. member, "adopted the same means and methods" (i.e., selling drugs and engaging in gun warfare with rival crews) to operate E.A.M. and establish dominance in East New York.  (ECF No. 231, Gov't Mot. at 24.)  Mr. Smothers argues that "nearly all" of the government's proffered evidence of other crimes, wrongs, or acts (i.e., Rule 404(b) evidence) is cumulative, prejudicial, or irrelevant to Mr. Smothers' charged offenses.  (ECF No. 236, Smothers Opp. at 5; ECF No. 287, Smothers Supp. Opp. at 14); *see* Rule 404(b).

The court finds that evidence that E.A.M. members enriched members of the enterprise by selling controlled substances in and around East New York, Brooklyn is relevant and admissible as direct evidence because it tends to prove the existence, organization, and nature of the alleged E.A.M. enterprise, and a pattern of racketeering activity by Mr. Smothers and his alleged co-conspirators.  *See United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) (affirming admission of

evidence of "cooperating Latin King members about drug sales and acts of violence they committed on behalf of the gang" to prove the existence, organization and nature of the RICO enterprise, as well as a pattern of racketeering activity by the defendants) (citing *United States v. DiNome*, 954 F.2d 839, 843-44) (2d Cir. 1992)).

The Indictment alleges that one of the purposes of the enterprise was to "enrich[] the members and associates of the enterprise through criminal activity, including narcotics trafficking and fraud." (Indictment at 3.)  The Indictment also alleges that among the means and methods by which Mr. Smothers, his co-defendants, and their associates conducted and participated in the conduct of the affairs of the enterprise included: "Members of the enterprise and their associates used, attempted to use and conspired to use drug trafficking and fraud as means of obtaining money." (*Id.*)  Thus, evidence of E.A.M. members selling controlled substances in and around East New York, Brooklyn has significant probative value to both the existence and pattern of underlying racketeering activity that Mr. Smothers is charged with in Count One.

The court also finds that evidence that E.A.M. routinely purchased and distributed firearms to its members for communal use in furtherance of their narcotics distribution activities, specifically to protect themselves and their

43

distribution territories, is admissible as direct evidence for both Count One and Count Two.  Evidence that Mr. Smothers would have had ready and consistent access to firearms has significant probative value to the existence and nature of the enterprise, and the pattern of racketeering activity.  *See United States v. Ashburn*, 2015 WL 588704, at *14 (E.D.N.Y. Feb. 11, 2015) (affirming admission of testimony that guns were purchased on behalf of the gang and then stored in communal locations where gang members "could gain easy access to them when necessary"); *see also Diaz*, 176 F.3d at 79 (affirming admission of testimony about uncharged crimes, including the "stockpiling of weapons to protect the gang's drug trade, and his related acts of violence" as tending "to prove the existence, organization and nature of the RICO enterprise, and a pattern of racketeering activity" by defendants).

Finally, the significant probative value of this evidence is not "substantially outweighed by the danger of unfair prejudice" pursuant to Rule 403.  Evidence of E.A.M.'s drug trafficking operations and E.A.M. members' ready access to firearms for communal use is clearly not any more inflammatory than the charged offenses, because the Indictment itself alleges criminal activity "including narcotics trafficking," and charges Mr. Smothers with possession of firearms during and in furtherance of a drug trafficking crime.  (Indictment at 5-6.)

44

5. <u>Access Device Fraud and Fraudulent Use of</u>
<u>Identification Documents</u>

The government seeks to introduce evidence that
members of E.A.M. engaged in fraud to earn and obtain money,
specifically, access device fraud and the use of fraudulent
identification documents to purchase food, gas, and other items
to further the enterprise's existence.  (ECF No. 231, Gov't Mot.
at 13.)  In particular, the government seeks to introduce
evidence related to a January 25, 2019 search of a storage unit
that "belonged to and was being used by" alleged E.A.M. member
Tyshawn Corbett, conducted pursuant to a judicially-authorized
warrant.  (ECF No. 275, Gov't Supp. Mot. at 14.)  The government
states that during the search, "law enforcement found, among
other things, two firearms, a money counter, a North Carolina
driver's license with [Tyshawn] Corbett's name and photo,
approximately $25,000 in cash in different denominations,
ammunition, blank cards that appear to be credit cards but with
no names or identifiers on the cards, and documents with
Corbett's name on them."  (*Id.* at 14.)  The government
represents that the lease agreement and related documents
demonstrate that the storage locker belonged to and was being
used by Mr. Corbett, who allegedly rented the storage unit with
the aid of a fraudulent Connecticut driver's license.  (*Id.*)

The foregoing evidence is admissible as direct
evidence of, and inextricably intertwined with, the charged
offenses.  Count One of the Indictment charges that Mr. Smothers
"agreed to conduct and participate, directly and indirectly, in
the conduct of the affairs of the enterprise" including conduct
"related to fraud and related activity in connection with
identification documents" and "fraud and related activity in
connection with access devices."  (Indictment at 5.)  *See United
States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) (holding that "an
act that is alleged to have been done in furtherance of the
alleged conspiracy . . . is not an 'other' act within the
meaning of Rule 404(b); rather, it is part of the very act
charged" and that where "the indictment contains a conspiracy
charge, 'uncharged acts may be admissible as direct evidence of
the conspiracy itself'") (internal quotations and citation
omitted).

Mr. Corbett's possession of firearms and fraudulent
identification documents are consistent with the charged
"conduct of the affairs of the enterprise."  It is of no import
that Mr. Smothers did not himself rent or control the storage
unit, as "a conspirator charged with racketeering conspiracy
need not commit or even agree to commit the predicate acts that
are elements of a substantive count to be found guilty of the
racketeering conspiracy, for it suffices that he adopted the

46

goal of furthering or facilitating the criminal endeavor." *See United States v. Ciccone*, 312 F.3d 535 542 (2d Cir. 2002) (internal quotations and citations omitted). Count One requires the government to prove, among other elements, that either Mr. Smothers *or* another member of the E.A.M. enterprise agreed to commit two racketeering acts (which may include acts of fraud with respect to identification cards and access devices in violation of federal law). The seizure of firearms, fraudulent access devices, and fraudulent identification documents from Mr. Corbett is thus directly probative of the charged racketeering conspiracy.

6. January 1, 2019 Car Stop of Tyshawn Corbett

The government seeks to introduce evidence of an NYPD car stop of Mr. Corbett on January 1, 2019. The government alleges that during the stop, the NYPD officers informed Mr. Corbett that the vehicle he was driving smelled like marijuana. The government further alleges that Mr. Corbett grabbed a bag from the trunk of the vehicle and fled from the officers before being apprehended after a short chase. (ECF No. 275, Gov't Supp. Mot. at 11-12.) The government states that near or inside the bag, NYPD officers recovered five bags containing a substance that appeared to be marijuana; another bag that later tested positive "for the presence of cocaine base that was distributed among 15 smaller bags"; and a digital scale. During

an inventory search of the vehicle Mr. Corbett was driving, the
NYPD also allegedly recovered a loaded, operable firearm with a
defaced serial number, and over $2,600 in cash.  (*Id.* at 12-13.)
Mr. Corbett was indicted for his possession of the firearm and
the cocaine, was subsequently charged in a superseding
indictment with possessing two additional firearms (recovered
from the storage locker discussed *infra*), and ultimately pleaded
guilty in that case to one count of being a felon in possession
of a firearm.  (*Id.*); *see United States v. Corbett*, No. 19-cr-46
(ILG).  Mr. Smothers argues that evidence of Mr. Corbett's car
stop is inadmissible as Rule 404(b) evidence, and in the
alternative, that the probative value of the evidence is
substantially outweighed by the unfair prejudice to Mr.
Smothers.  (ECF No. 287, Smothers Supp. Opp. at 12-20.)

As stated above regarding the fatal shooting of
Michael Tenorio and of the two shootings of John Doe #1, the
court finds that evidence of Mr. Corbett's car stop is
admissible against Mr. Smothers as direct evidence of the
existence and nature of the racketeering conspiracy, and of the
pattern of racketeering activity on the part of enterprise
members and associates, including Mr. Smothers.  Mr. Corbett was
allegedly a known member of E.A.M., the car stop took place
during the time period of the conspiracy alleged in the
Indictment, 2006 – 2019, and the Indictment alleges, *inter alia*:

48

"Members and associates of E.A.M. have engaged in drug trafficking and firearms trafficking."  (Indictment at 1-2.) Proof of the RICO enterprise and of the pattern of racketeering activity "may well entail evidence of numerous criminal acts by a variety of persons."  *United States v. DiNome*, 954 F.2d 839, 843 (2d Cir. 1992); *see also United States v. Basciano*, 599 F.3d 184, 207 (2d Cir. 2010) ("A single pattern of racketeering may be common to a number of defendants and, in such circumstances, even though individual defendants may reasonably claim no direct participation in the acts of others, evidence of those acts is relevant to the RICO charges against each defendant.") (internal quotations and citation omitted).

The government also argues that evidence that Mr. Corbett was "twice arrested for firearms possession, including in furtherance of a drug trafficking conspiracy, is also direct evidence of the charge against the defendant for possessing a firearm in furtherance of, and during a drug trafficking crime, in violation of 18 U.S.C. § 924(c)," as charged in Count Two of the Indictment.  (ECF No. 275, Gov't Supp. Mot. at 34.)  Per the well-established *Pinkerton* theory of liability, a conspirator "can be held responsible for the substantive crimes committed by his co-conspirators to the extent those offenses were reasonably foreseeable consequences of acts furthering the unlawful agreement, even if he did not himself participate in the

49

substantive crimes." *United States v. Masotto*, 73 F.3d 1233,
1239 (2d Cir. 1996) (citing *United States v. Romero*, 897 F.2d
47, 51) (2d Cir. 1990)).  The government states that it "expects
to prove that E.A.M. members and associates communicated with
one another regarding the use of firearms (and even the location
of particular firearms) to maintain the Enterprise by, for
example, protecting territory."  (ECF No. 275, Gov't Supp. Mot.
at 34.)

Under the *Pinkerton* theory, the evidence would be
admissible as direct evidence against Mr. Smothers as to Count
Two, although, of course, the government must prove at trial
that Mr. Corbett and Mr. Smothers were co-conspirators as to
Count One of the Indictment, and that Mr. Corbett's possession
of a firearm in furtherance of the racketeering conspiracy
charged in Count One was reasonably foreseeable to Mr. Smothers.
(Indictment at 5-6); *see United States v. Bruno*, 873 F.2d 555,
560 (2d Cir. 1989) ("Whether a particular substantive crime is
foreseeable and in furtherance of the conspiracy is a factual
question to be determined by the jury.").

### D. E.A.M.'s Methods and Means of Control

The government intends to introduce evidence that
E.A.M. used a variety of methods and means to ensure that its
members obeyed rules and orders from E.A.M.'s leaders, including
Mr. Smothers.  Specifically, CW-1 is expected to testify that he

was responsible for beating new members of E.A.M. as a form of initiation into the gang, and that E.A.M.'s leadership (leadership which the government alleges included the defendant) ordered CW-1 to beat other people. (ECF No. 231, Gov't Mot. at 15.) CW-2 also expects to testify that E.A.M. leadership ordered "physicals" (i.e., beatings) when junior E.A.M. members disrespected senior members or did not have money to contribute to E.A.M.'s communal finances (the "kitty"). (*Id.*)

The government also intends to prove that E.A.M. members had communal access to guns, which they used to protect themselves and their territory and fight enemies. (*Id.*) CW-1 is expected to testify that on several occasions, he and other E.A.M. members used guns to intimidate and hurt individuals with whom they were fighting, including an instance where CW-1 fired shots in the air during a feud between E.A.M. and a rival crew. (*Id.*) CW-1 is also expected to testify that he and an E.A.M. associate retrieved a gun and shot at a male individual for flirting with the associate's girlfriend, striking him in the leg. CW-1 is further expected to testify that he later gave that gun to another E.A.M. associate, who used it to shoot at his gang rivals. (*Id.*) Mr. Smothers argues that introduction of this evidence would cause unfair and overwhelming prejudice, which would contribute to improper conviction by virtue of guilt by association alone. (ECF No. 236, Smothers Opp. at 13.)

51

1. Direct Evidence of and Evidence that is
   Inextricably Intertwined with the Enterprise and
   Conspiracy

   The court finds that the government's proffered
evidence of E.A.M.'s methods and means of control is admissible
as direct evidence of the existence of the charged enterprise,
E.A.M.'s pattern of racketeering activity, operations in
furtherance of the charged enterprise, and the alleged
leadership role of Mr. Smothers in the charged enterprise.  *See
United States v. Thai*, 29 F.3d 785, 813 (2d Cir. 1994) (holding
that testimony that two defendants had beaten a fellow gang
member because of misbehavior was "evidence as to the existence
and structure of the BTK enterprise, as to the leadership roles
played by [defendants], and as to the discipline imposed by the
BTK leaders on the rank-and-file members"); *United States v.
Ashburn*, 2015 WL 588704, at *14 (E.D.N.Y. Feb. 11, 2015)
(holding that "where the Government contends that members of Six
Tre were beaten by other Six Tre members when they engaged in
disfavored conduct, such testimony is admissible as evidence of
the existence and structure of the criminal organization");
*United States v. Bourne*, 2011 WL 4458846, at *15 (E.D.N.Y. Sept.
23, 2011) (stating that assault on member of criminal
organization who stole cocaine "was done in furtherance of the
continuing criminal enterprise, indicates [defendant's]

leadership role and his participation, and is inextricably tied
to the charged conduct").

Mr. Smothers argues that such evidence would present a
danger of unfair and overwhelming prejudice, and thus run afoul
of Rule 403.  (ECF No. 236, Smothers Opp. at 13-14.)  Mr.
Smothers also argues that introduction of the evidence would
contribute to improper conviction by virtue of guilt by
association alone, and that guilt by association "is implicated
when a conspiracy conviction is based on evidence that the
individual is affiliated with a gang which has a general rivalry
with other gangs, and that this rivalry sometimes escalates into
violent confrontations."  (*Id*. at 14.)  The court finds that the
probative value of this evidence is not substantially outweighed
by the risk of unfair prejudice under Rule 403 because, under
the Second Circuit's standard in *Livoti*, the evidence of
E.A.M.'s means and methods of control is no more inflammatory
than the offenses with which Mr. Smothers is charged.  *See,
e.g., Bourne*, 2011 WL 4458846, at *15 (noting that while the
alleged assault was "serious," it was "no more inflammatory than
the charged conduct"); *see also United States v. Rivera*, 2015 WL
1875658, at *8 (E.D.N.Y. Apr. 22, 2015).

### 2. Rule 404(b)

Because the court finds that evidence of E.A.M.'s
methods and means of control is admissible as direct evidence of

the existence of the charged RICO enterprise, E.A.M.'s pattern of racketeering activity, operations in furtherance of the charged enterprise, and the alleged leadership role of Mr. Smothers in the charged enterprise, the court need not reach the admissibility of this evidence under Rule 404(b).

### E. Facts of Prior Incarcerations and Prior Convictions

The government seeks to introduce evidence of certain prior convictions of Mr. Smothers; the fact of Mr. Smothers' prior incarceration; and evidence of the impact that Mr. Smothers' prior incarcerations had on the E.A.M. organization. (ECF No. 231, Gov't Mot. at 16-17.)  For example, the government anticipates that one or more cooperating witnesses will testify to the organizational structure and hierarchy of E.A.M., including the changes in E.A.M. leadership that occurred when senior members of the gang were imprisoned, as well as E.A.M.'s financial support of incarcerated members.  (*Id.* at 16.) Specifically, the government represents that CW-1 is expected to testify that Mr. Smothers and other E.A.M. members had the "top" spot in the organization when they were in jail, but that their responsibilities shifted when they were released from jail.  CW-1 will also testify that at one point, CW-1 was in charge of the "streets," but when Mr. Smothers was released, Mr. Smothers re-assumed control of that territory.  CW-1 is further expected to testify that he and other members sent money to Mr. Smothers and

other incarcerated E.A.M. members as per the rules of the

organization.  (*Id.* at 16.)

          The government also seeks to offer evidence of the

following convictions:

- On May 4, 2016, the defendant was convicted upon a plea of
  guilty to Attempted Criminal Possession of a Weapon
  (Previous Conviction), a class E felony under New York
  Penal Law § 265.02(1), and subsequently sentenced to one-
  and-a-half to three years' imprisonment. The defendant was
  arrested for this offense on June 16, 2014 after pointing a
  firearm at a member of the NYPD; a firearm was recovered
  from the scene.

- On August 13, 2013, the defendant was convicted upon a plea
  of guilty to Attempted Criminal Possession of a Weapon in
  the Second Degree (Loaded Firearm), a class D felony under
  New York Penal Law § 265.03(3), and subsequently sentenced
  to one to three years' imprisonment.[2]

- On November 9, 2010, the defendant was convicted upon a
  plea of guilty to Attempted Criminal Facilitation in the
  Fourth Degree, a class B misdemeanor under New York Penal
  Law § 115.00, and was subsequently sentenced to time
  served. The defendant was arrested for this offense on
  January 23, 2010, and was charged by complaint with
  Criminal Possession of a Controlled Substance in the
  Seventh Degree, for selling controlled substance to an
  undercover officer inside of 179 Milford Street in
  Brooklyn.

(*Id.* at 16-17.)

          The government argues that Mr. Smothers' prior

convictions and records of imprisonment "are inextricably

---

[2] The government states: "[Mr.] Smothers was released from custody on March
28, 2014, and his parole term was revoked on September 6, 2016, following his
conviction" on May 4, 2016 relating to the June 16, 2014 arrest.  (ECF No.
231, Gov't Mot. at 17 n.5.)  The government also states: "The conviction and
sentence [on August 13, 2013] relate to the defendant's shooting of
Individual-1," as discussed *supra*, in Section II.C.1.  (*Id.* at 17.)

intertwined with and necessary to complete the story of the charged offenses and are thus admissible as direct evidence of the charged offenses at trial." (ECF No. 231, Gov't Mot. at 32.) Mr. Smothers opposes the government's introduction of his prior convictions on the grounds that: (a) the prior convictions would "simply be used as propensity evidence" in violation of Rule 404(b) because they "suggest first and foremost that he has a propensity to possess firearms criminally." (ECF No. 236, Smothers Opp. at 15-16.) and (b) the prior convictions' probative value is substantially outweighed by the danger of unfair prejudice, as the "knowledge that Mr. Smothers had prior convictions would prevent a jury from making an impartial determination." (*Id.*)

### 1. Direct Evidence of and Evidence that is Inextricably Intertwined with the Enterprise and Conspiracy

The court finds that evidence of the fact of Mr. Smothers' prior incarceration; of the impact of Mr. Smothers' prior incarceration on E.A.M.; and of his November 9, 2010, August 13, 2013, and May 4, 2016 convictions is admissible as direct evidence of the charged conspiracy. First, CW #1's expected testimony about how Mr. Smothers' role within E.A.M. leadership changed depending on his incarceration status is "necessary to complete the story of the crime on trial," *Gonzalez*, 110 F.3d at 942 (internal quotations and citations

omitted).  CW-1's testimony is also probative of the nature of
the enterprise, including the "relatedness and continuity
essential to a pattern, thereby helping to establish that the
defendant's own acts constitute a pattern within the meaning of
RICO." *Basciano*, 599 F.3d at 206-07 (internal quotations and
citations omitted).  Second, the government represents that CW-1
will testify that 179 Milford Street is one of the areas where
E.A.M. members sold crack cocaine in East New York.
Consequently, Mr. Smothers' November 9, 2010 drug conviction
arising from his sale of a controlled substance to an undercover
officer is directly probative of E.A.M.'s drug trafficking
operations.  Third, Mr. Smothers' August 13, 2013 conviction and
sentence was related to his 2011 shooting of Individual-1,
discussed *supra,* in Section II.C.1.  As such, the conviction is
also direct proof of "the existence of a criminal enterprise in
which [defendant] participated."  *See United States v. Matera*,
489 F.3d 115, 120 (2d Cir. 2007).

       The court finds that Mr. Smothers' May 4, 2016
conviction is also relevant and admissible as direct evidence.
The government contends that "evidence of the defendant's prior
firearms convictions during the time period of the charged
racketeering conspiracy [between 2006 and 2019] is direct proof
that he used and possessed (and aided and abetted others in
using and possessing) firearms, in furtherance of the

racketeering enterprise," (ECF No. 231, Gov't Mot. at 32-33.) and, more generally, that the convictions "were a part of his years-long criminal relationship with his co-conspirators." (ECF No. 235, Gov't Opp. at 6.)  Mr. Smothers' conviction of attempted criminal possession of a weapon in 2016, during which he pointed a firearm at an officer, is direct proof that he used and possessed firearms, in furtherance of the racketeering enterprise, and direct proof of his access to and possession of firearms, as relevant to Count Two.

### 2. Rule 404(b)

The court addresses the government's argument in the alternative that Mr. Smothers' 2016 conviction is admissible under Rule 404(b) to prove intent, opportunity and absence of mistake.  Evidence of prior crimes, "especially crimes nearly identical to those presently charged – may be offered for the proper purpose of proving the defendant's knowledge or absence of mistake."  *See United States v. Tsekhanovich*, 251 F. App'x 706, 707 (2d Cir. 2007) (summary order); *see also United States v. Barret*, No. 10-CR-809 (KAM), 2011 WL 6704862, at *19 (E.D.N.Y. Dec. 21, 2011), *aff'd*, 677 F. App'x 21 (2d Cir. 2017) (summary order).  Here, Mr. Smothers' 2016 conviction demonstrates his knowledge of and access to firearms, which provides "obvious probative value" to Count Two (Possessing a Firearm During a Drug Trafficking Crime).  *See United States v.*

58

*Barris*, 377 F. App'x 93, 96 (2d Cir. 2010) (summary order).
Although there is some prejudicial effect to the admission of
evidence of prior crimes, the court exercises its discretion to
find that the probative value of the 2016 prior conviction
outweighs any such prejudicial effects.

### F. Communications in Furtherance of the Conspiracy

The government seeks to introduce evidence of
communications between members of E.A.M. regarding the
enterprise and its activities, via written messages (such as
text messages or via applications) and via social media.  (ECF
No. 275, Gov't Supp. Mot. at 15; 38.)  The government describes
the categories of evidence as follows:

- The testimony of witnesses about statements by the defendant and his co-conspirators before and after multiple shootings, including the April 21, 2015 murder of Michael Ten[o]rio, the March 7, 2016 and June 28, 2018 shootings of rival John Doe #1, and the June 10, 2018 and July 28, 2018 Shooting of rival John Doe #2 (the "E.A.M. Shootings"), as well as regarding narcotics distribution;

- Recorded jail telephone calls between E.A.M. members regarding the defendant's control of a particular territory, as well as the Enterprise's plan to retaliate against John Doe #2, including by planning an[] assault against John Doe #2 while [John Doe #2 was] in the custody of the New York Department of Corrections;

- Witness testimony as to statements by non-testifying co-defendants and uncharged Enterprise members regarding their own intentions to murder, assault or retaliate against members of rival crews and admissions that they, in fact, did so, including one such admission by the defendant (as outlined above);

59

- Social media posts, photograph captions and
  communications evidencing Enterprise relationships and
  loyalty among its members (for example, "I be Dam if I
  lose another one of my brothers #glbackforeva after him 0
  tolerance on God"), as well as participation in unlawful
  activity or celebration of ill-gotten gains (for example,
  use of coded language to reference narcotics activity).[3]

(ECF No. 275, Gov't Supp. Mot. at 15-19, 38.)

Under Federal Rule of Evidence 801(d)(2)(E), a

statement "offered against an opposing party and . . . made by

the party's coconspirator during and in furtherance of the

conspiracy" is not hearsay.  Extra-judicial statements by co-

conspirators may be admitted if the government establishes by a

preponderance of the evidence that there was a conspiracy, that

both the declarant and the party against whom the statements are

offered were members of the conspiracy, and that the statements

were made during and in furtherance of the conspiracy.

*Bourjaily v. United States,* 483 U.S. 171, 175-76 (1987) (quoting

Fed. R. Evid. 801(d)(2)(E)); *United States v. Orena,* 32 F.3d

704, 711 (2d Cir. 1994).  As the Second Circuit has noted, "[i]n

making these preliminary factual determinations under Federal

Rule of Evidence 104(a), the court may consider the hearsay

statements themselves.  However, these hearsay statements are

---

[3] The government notes that the examples of and types of statements outlined
in their Supplemental Motion *in Limine* "are representative of the statements
that the government intends to introduce at trial as direct evidence," "is by
no means exhaustive," and that they "reserve the right to introduce as
evidence statements of a similar nature that are not outlined" in their
Motion.  (ECF No. 275, Gov't Supp. Mot. at 38 n.7.)

presumptively unreliable, and, for such statements to be
admissible, there must be some independent corroborating
evidence of the defendant's participation in the conspiracy."
*United States v. Tellier*, 83 F.3d 578, 580 (2d Cir. 1996)
(internal quotations and citations omitted).

The government asserts that at trial, they "will
present substantial evidence that the defendant and the
declarants were part of the same racketeering conspiracy
involving the Enterprise charged in the Indictment and that the
statements were made in furtherance of the charged racketeering
conspiracy because they either were, among other reasons, (i) in
furtherance of the agreed-upon pattern of racketeering activity;
(ii) in furtherance of the E.A.M. Shootings or narcotics
distribution; (iii) to keep each other informed about acts of
violence carried out by members of the Enterprise and the
presence of law enforcement; or (iv) to promote the Enterprise's
reputation for violence."  (ECF No. 275, Gov't Supp. Mot. at
39.)

Based on the record before the court, the government
has established that it intends to prove by a preponderance of
the evidence that there was a criminal conspiracy and that the
defendant was a member of the conspiracy.  Although the court
reserves decision as to whether the specific declarants of the
communications were members of the conspiracy, the government

61

anticipates that it will be able to prove by a preponderance of the evidence that they were members of the conspiracy.  Assuming then, that the government can prove by a preponderance of the evidence that the declarants were members of the conspiracy and that the statements were made during and in furtherance of the conspiracy, as well as provide independent corroborating evidence of Mr. Smothers' participation in the racketeering conspiracy to which the relevant statement and communications relate, the co-conspirator statements proffered by the government are likely to be admissible against Mr. Smothers pursuant to Federal Rule of Evidence 801(d)(2)(E).

### III. Mr. Smothers' Motion *in Limine*

#### A. Prison Phone Calls (Bates-stamped EAM000740-EAM000747)

Mr. Smothers objects to the admission of "the prison phone calls Bates-stamped EAM000740-EAM000747 and all other calls in which Mr. Smothers is not a participant of the conversation," on the grounds that their probative value is substantially outweighed by the danger of unfair prejudice under Rule 403.  (ECF No. 238, Smothers Reply at 1-2.)  As an initial matter, the court notes that in Mr. Smothers' motion *in limine*, he only makes a vague reference to "2018 prison phone calls." His motion *in limine* contains no information as to the participants, dates, or contents of the phone calls at issue. In its opposition, the government notes it was "exercising its

62

judgment about the calls to which the defendant is referring but welcomes additional clarity about which calls the defendant seeks to exclude" and identified the phone calls as Bates-stamped EAM000740-EAM000747.   (ECF No. 235, Gov't Opp. at 12 n.1.)   The government's description of those phone calls is as follows:

> All of the calls are between an incarcerated E.A.M. member and other fellow co-conspirators in the Enterprise, including CW-1. On the calls, the E.A.M. members discuss, among other things, the Enterprise and their affiliation with E.A.M. (which goes toward proving the existence of the E.A.M.); their knowledge of an affiliation with the defendant Smothers; and their understanding of the defendant's role in the organization (both of which go towards proving the defendant's relationship [sic] in E.A.M. and its members and his involvement in the charged conspiracy).

(*Id*. at 12-13.)

The government also states that some of the phone calls include the following: "active discussions about the E.A.M. members about ordering and carrying out the assault of John Doe #2 in jail in retaliation for John Doe #2's shooting at co-defendant Corbett"; "E.A.M. members actively talking about the E.A.M. and their drug trafficking activities," including a reference to how an E.A.M. member needed to ask "Chuck" (the government asserts that "Chuck" and "Chucky" are aliases of the defendant (*see* Indictment at 1), for permission to sell drugs on

63

a particular street because that location allegedly "used to be Chuck block, it's still Chuck's block."  (ECF No. 235, Gov't Opp. at 12-13.)

### 1.  Direct Evidence of and Evidence that is Inextricably Intertwined with the Enterprise and Conspiracy

The court finds that the phone calls Bates-stamped EAM000740-EAM000747 are admissible as direct evidence.  Although Mr. Smothers may not have been a participant in those calls, other E.A.M. members' discussions regarding E.A.M.; their own affiliations with the E.A.M. enterprise; and in particular their knowledge of and affiliation with Mr. Smothers, clearly have significant probative value in proving the existence of E.A.M. itself and of Mr. Smothers' association with the enterprise.  A phone call discussing how a member needed to request Mr. Smothers' permission to sell drugs on a particular street is similarly admissible because it goes towards proving Mr. Smothers' role in E.A.M.'s drug trafficking activities, specifically that he appears to have held some position of authority.  Such evidence is clearly probative of Mr. Smothers' direct knowledge of and involvement with the E.A.M. enterprise.

### 2.  Rule 801(d)(2)(E)

Mr. Smothers further argues that the calls are between other individuals and "[a]lthough the calls may suggest a pattern of racketeering activity, the individuals do not make

64

any reference to Mr. Smothers' alleged affiliation to [E.A.M.] or involvement in the charged conspiracy." (ECF No. 238, Smothers Reply at 3.) Mr. Smothers contends that, as a result, "it cannot be said that Mr. Smothers promoted or facilitated the achievement of the goals of the alleged conspiracy." (*Id.*) Rule 801(d)(2)(E), however, does not instruct that co-conspirator statements are only admissible against those who either made or heard the statements. "Co-conspirator statements are admissible against all members of a conspiracy" so long as they are in fact made "in furtherance" of that conspiracy. *Simmons*, 923 F.2d at 945.

Assuming that the government can prove by a preponderance of the evidence that the declarants were members of the conspiracy and that the statements were made during and in furtherance of the conspiracy, and provide independent corroborating evidence of Mr. Smothers' participation in the racketeering conspiracy to which the relevant statement relates, the portions of calls discussing the ordering and carrying out of the assault on John Doe #2 are admissible pursuant to Federal Rule of Evidence 801(d)(2)(E), as the statements were intended to keep members of the alleged Enterprise informed of E.A.M.'s rivals and significant events in the conspiracy. *See United States v. Torre*s, 435 F. Supp. 3d 526, 533 (S.D.N.Y. 2020) (admitting a portion of a call intended to apprise another

member of the conspiracy of a significant event, the targeting
and shooting of a rival).  Statements about acts committed in
the course of the racketeering conspiracy will generally be
admissible if they "apprise a co-conspirator of the progress of
the conspiracy."  *See United States v. Rahme*, 813 F.2d 31, 36
(2d Cir. 1987).  For the same reasons, the portions of calls
discussing E.A.M. and its drug trafficking activities are likely
to be admissible as co-conspirator statements made in
furtherance of the conspiracy.

## CONCLUSION

For the foregoing reasons, the court GRANTS (1) the
government's motions *in limine* except to the extent qualified
herein, and (2) DENIES Mr. Smothers' motion *in limine* to
preclude the 2018 phone calls Bates-stamped EAM000740-EAM000747.

Finally, the government has also requested that the
court preclude Mr. Smothers from referencing at trial any
consequences of his conviction.  (ECF No. 275, Gov't Supp. Mot.
at 41.)  As Mr. Smothers has represented that he "does not
intend to argue any facts regarding punishment or collateral
consequences," the court finds the government motion on this
point to be moot.  (*See* ECF No. 287, Smothers Supp. Opp. at 24.)

The government also requests that the court set a
schedule ordering Mr. Smothers to disclose and identify any
exhibits that he intends to introduce at trial, whether through

66

cross-examination during the government's case-in-chief or during any defense case, and that the court order disclosure of the defense witnesses' statements under Fed. Crim. R. Pro. 26.2. (ECF No. 275, Gov't Supp. Mot. at 43.)  Mr. Smothers represents that (1) "[i]n the event an exhibit is identified that is within the defense [sic] sole custody, that is not going to be used solely for impeachment purposes but rather to prove Mr. Smothers' case-in-chief, the defense will provide to the government on two-days notice any case-in-chief exhibit before a witness testifies," and that (2) at this time, the defense has no witnesses other than Mr. Smothers if he chooses to testify. (ECF No. 287, Smothers Supp. Opp. at 24.)  Mr. Smothers also states that he "does not forfeit [his] right to produce an exhibit, for which notice has not been given, if discovered by the defense during trial that supports its case-in-chief based on the testimony of a government's witness that was not anticipated."  (*Id.*)  The court orders the defense to produce any exhibit that will not be used solely for impeachment purposes to the government with two-days' notice before a witness testifies, regardless of whether such an exhibit is in the defense's sole custody.  *See United States v. Napout*, 2017 WL 6375729, at *7 (E.D.N.Y. Dec. 12, 2017) ("Rule 16 requires Defendants to identify all non-impeachment exhibits they intend to use in their defense at trial, whether the exhibits will be

introduced through a government witness or a witness called by a Defendant."); *see also* Fed. R. Crim. Pro. 16(b)(1)(A)(i).  The court also orders that if a defense witness other than Mr. Smothers is to testify, such Rule 26.2 material shall be produced to the government at least two days prior to such witness testimony.

**SO ORDERED.**

Dated: January 20, 2023
       Brooklyn, New York

_____
KIYO A. MATSUMOTO
United States District Judge
Eastern District of New York