UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

UNITED STATES OF AMERICA

       - against -

QUANDEL SMOTHERS,
   *also known as "Chucky"*

              Defendant.

----------------------------------------X

**MEMORANDUM AND ORDER**
20-cr-213 (KAM)

**KIYO A. MATSUMOTO, United States District Judge:**

On February 1, 2023, a jury in the Eastern District of New York found defendant Quandel Smothers ("Mr. Smothers") guilty of (1) racketeering ("RICO") conspiracy, in violation of 18 U.S.C. § 1962(d) and (2) possession of a firearm during a drug trafficking crime, in violation of 18 U.S.C. § 924(c). Before the Court is Mr. Smothers' motion for a judgment of acquittal or, in the alternative, for a new trial, pursuant to Federal Rules of Criminal Procedure 29 ("Rule 29") and 33 ("Rule 33"). (ECF No. 334 ("Def. Mem."); ECF No. 340 ("Gov't Opp."); ECF No. 345 ("Def. Reply"); ECF No. 372 ("Def. Supp. Mot."); ECF No. 384 ("Gov't Supp. Opp."); ECF No. 388 ("Def. Supp. Reply.").) For the reasons set forth below, the Court DENIES Mr. Smothers' motions.

## BACKGROUND

### I.   The Charges Against Mr. Smothers

Mr. Smothers was charged in two counts of a twenty-count Indictment, filed on June 18, 2020. (ECF No. 1 ("Indictment").)

Count One charged Mr. Smothers and four co-defendants with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). Count Two charged Mr. Smothers and the same four co-defendants with possession of a firearm during a drug trafficking crime, in violation of 18 U.S.C. 924(c). (*Id*. at 5-6.)

The charges against Mr. Smothers stemmed from his involvement with a group known as Elite Assassins Millas ("E.A.M."), a subgroup of the Bloods street gang. (*Id*. at 1.) The Indictment alleged that E.A.M. was comprised of individuals residing in and around Brooklyn and the Bronx, New York, among other places. It further alleged that members and associates of E.A.M. have engaged in drug trafficking and firearms trafficking, and have committed acts of violence, including acts of murder and assault, as well as other crimes. (*Id*. at 1-2.)

## II.  Mr. Smothers' Trial and the Jury Verdict

Jury selection for Mr. Smothers' trial commenced on January 23, 2023, and trial commenced later that same day. The government presented its case-in-chief over the course of the next week and rested on January 30, 2023. (ECF No. 337 ("Tr.") at 1466.[1])  The defense did not present a case, and the Court held a charging conference with the parties that same day, and in the

---

[1] The trial transcript in its entirety is on the docket as ECF Nos. 330-33, 337-39, and 363 and is consecutively paginated when taken together. Accordingly, the Court shall refer to the transcript as "Tr." and with the corresponding pincite.

presence of Mr. Smothers himself.  On January 31, 2023, after the parties gave their closing arguments, the Court began charging the jury.  On February 1, 2023, after the Court finished charging the jury and following jury deliberations, the jury convicted Mr. Smothers of Counts One and Two.

**LEGAL STANDARD**

### I.   Rule 29 Motion for a Judgment of Acquittal

In resolving a Rule 29 motion, a court should "avoid usurping the role of the jury." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999).  A reviewing court must consider the totality of the evidence "in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. White*, 7 F.4th 90, 98 (2d Cir. 2021)(quotations omitted); *see also United States v. Bala*, 236 F.3d 87, 93-94 (2d Cir. 2000) (A court must "defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony.").

Moreover, a court cannot "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *Guadagna*, 183 F.3d at 129 (citation and quotation omitted); *see also United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016) (cleaned up);

*United States v. Hampton*, No. 21-cr-766 (JPC), 2023 WL 3934546, at *5 (S.D.N.Y. June 9, 2023). A court must evaluate the evidence in a sufficiency challenge "in conjunction," rather than "piecemeal or in isolation." *United States v. Klein*, 913 F.3d 73, 78 (2d Cir. 2019); *see also Guadagna*, 183 F.3d at 130 (noting that "each fact may gain color from others").

Finally, a court may enter a judgment of acquittal "only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Guadagna,* 183 F.3d at 130 (internal quotation marks and citations omitted); *see also United States v. Jackson,* 335 F.3d 170, 180 (2d Cir. 2003) (district court may grant Rule 29 motion for judgment of acquittal on grounds of insufficient evidence only "if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt"); *White*, 7 F.4th at 98 ("A conviction must be upheld if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.") (emphasis in original) (internal quotation marks and citation omitted). Consequently, a defendant challenging his conviction on sufficiency grounds "face[s] a heavy burden, as the standard of review is exceedingly deferential to the jury's apparent determinations." *United States v. Davis*, No. 21-1486, 2023 WL 4582002, at *1 (2d Cir. July 18, 2023) (citing *United States v. Flores*, 945 F.3d 687, 710 (2d Cir. 2019)).

## II.  Rule 33 Motion for a New Trial

Rule 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted."  *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (internal quotation marks omitted); *see also United States v. Walker,* 974 F.3d 193, 208 (2d Cir. 2020) ("[T]he ultimate test is whether letting a guilty verdict stand would be a manifest injustice.") (citation omitted); *United States v. Triumph Cap. Grp., Inc.*, 544 F.3d 149, 159 (2d Cir. 2008) ("Generally, a motion for a new trial should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.") (internal quotation marks and citation omitted).

Although the Second Circuit "generally allow[s] district courts greater deference to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, courts must nonetheless exercise Rule 33 authority sparingly and in the most extraordinary circumstances."  *United States v. Cote*, 544 F.3d 88, 101 (2d Cir. 2008)(internal quotation marks omitted).

## DISCUSSION

Mr. Smothers first made a Rule 29 motion after the government rested.  The Court reserved decision at that time after hearing from both parties.  (Tr. 1467-73.)  Pursuant to Rule 29(b), if a court reserves decision, it must "decide the motion on the basis of the evidence at the time the ruling was reserved."  Fed. R. Crim. P. 29(b).  The following discussion presents only some evidence from trial and as is necessary to resolve the motions at hand.  *See, e.g., United States v. Ray*, No. 20-cr-110 (LJL), 2022 WL 17175799, at *3 (S.D.N.Y. Nov. 23, 2022).

## I.   Rule 29 - RICO Conspiracy (Count One)

### A. Legal Standard

The evidence supports the jury's conviction of Mr. Smothers for racketeering conspiracy.  The Court properly, and without objection (Tr. at 1483), instructed the jury that to find Mr. Smothers guilty on Count One, it would have to conclude beyond a reasonable doubt that there was an agreement among two or more persons to participate in an enterprise which would affect interstate or foreign commerce through a pattern of racketeering activity; that Mr. Smothers knowingly and intentionally became a member of the conspiracy charged in the Indictment; and that Mr. Smothers participated in some manner in the overall affairs of the enterprise and objectives of the conspiracy, and that he agreed to do so with the intent that he or another member or members of the

charged RICO conspiracy would commit two or more racketeering acts of the types specified in the indictment.  (*Id.* at 1676-77, 1684, 1686); *see also Ray*, 2022 WL 17175799, at *3 (citing *United States v. Hicks*, 5 F.4th 270, 275 (2d Cir. 2021), *cert. denied*, 212 L. Ed. 2d 34, 142 S. Ct. 1157 (2022); *United States v. Zemlyansky*, 908 F.3d 1, 11 (2d Cir. 2018)).

Importantly, to prove racketeering conspiracy, the government "need not prove that [the defendant] knowingly agreed to facilitate any specific predicate act." *Zemlyansky*, 908 F.3d at 11; *see also United States v. Curry*, 542 F. Supp. 3d 197, 201 (W.D.N.Y. 2021) ("Notably, proof of a conspiracy to commit predicate acts is not required."), *reconsideration denied,* No. 17-cr-103-LJV-HKS-7, 2021 WL 4987923 (W.D.N.Y. Oct. 27, 2021). Rather, "to be convicted as a conspirator under RICO, one must be shown to have possessed knowledge of only the general contours of the conspiracy." *White,* 7 F.4th at 99 (cleaned up); *see also United States v. Yannotti*, 541 F.3d 112, 122 (2d Cir. 2008) (noting that, to be found guilty of RICO conspiracy, a defendant "need only know of, and agree to, the general criminal objective of a jointly undertaken scheme"); *Zemlyansky*, 908 F.3d at 11. Finally, it is well established that "when the offense at issue is conspiracy, deference to the jury's findings is especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a

conspiracy can be laid bare in court." *Flores*, 945 F.3d at 710 (internal quotation marks and citation omitted).

### B. Mr. Smothers' Arguments

Mr. Smothers' primary argument is that the government's case against him "rested squarely on the shoulders of the testimony provided by John Warren, Damian Bullock, and Andrew Campbell. However, it is clear that John Warren and Andrew Campbell were biased and that they both had a clear motive to testify falsely." (Def. Mot. at 8.)

Mr. Smothers argues that Warren's testimony could not support a jury verdict because: (1) his testimony was "more than improbable in view of his motive for fabrication" (i.e., receiving a 5K letter from the government in exchange for his testimony); (2) his testimony was not credible because "Warren has consistently given false information to the police and to the [c]ourts"; (3) his testimony was "conclusory and not specific with details regarding actions committed by Quandel Smothers as the alleged head 'Godfather' of the E.A.M." and (4) that the government "failed to establish through Mr. Warren, or any other witness for that matter, that Mr. Smothers committed any crimes on behalf of E.A.M., derived proceeds for crimes as the head of E.A.M. or that [Smothers] was ever in possession of a firearm during drug dealings." (*Id.* at 24-25.) As to Andrew Campbell, Mr. Smothers argues that Campbell "offered no testimony that Mr. Smothers

himself committed any crime in furtherance of E.A.M., that he profited from any crimes, or that he was the leader of E.A.M," and that there was "no specific proof of Mr. Smothers having a leadership role other than Mr. Campbell's conclusory testimony." Mr. Smothers also argues that Campbell's testimony "served to demonstrate only that he himself committed crimes but not at the behest of Mr. Smothers as the alleged leader of E.A.M." and that Campbell also "had a clear motive to lie to receive a 5K letter and be able to go home as early as possible." (*Id.* at 39-40.)

These arguments are unavailing. A reviewing court "must defer to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Pugh*, 945 F.3d 9, 19 (2d Cir. 2019) (cleaned up). Accordingly, it is well-established that it "is the province of the jury and not of the court to determine whether a witness who may have been inaccurate, contradictory and even untruthful in some respects was nonetheless entirely credible in the essentials of his testimony." *United States v. O'Connor,* 650 F.3d 839, 855 (2d Cir. 2011) (internal quotation marks and citation omitted). "The proper place for a challenge to a witness's credibility is in cross-examination and in subsequent argument to the jury . . . not in a motion for a judgment of acquittal." *United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012) (cleaned up).

Here, both Warren and Campbell were cross-examined at length by defense counsel on the same issues that Mr. Smothers raises in his post-trial motions, and defense counsel reiterated such arguments during summation: the witnesses hope for a 5K letter and leniency at sentencing in exchange for their testimony; they testified that Mr. Smothers did not participate in all of the acts they testified about at trial; and they made admissions at trial that they had previously lied under oath.  Moreover, even if an accomplice's testimony were to "lack [] corroboration" — which is not the case here, as explained *infra* — that "goes only to the weight of the evidence, not to its sufficiency," which itself "is a matter for argument to the jury, not a ground for reversal on appeal."  *See United States v. Hamilton,* 334 F.3d 170, 179 (2d Cir. 2003).

Finally, to the extent Mr. Smothers argues that the testimony of Warren and Campbell did not establish that Mr. Smothers himself committed any crimes on behalf of or in furtherance of E.A.M., or that Mr. Smothers profited from any crimes, these arguments are unavailing.  Even assuming, *arguendo*, that the Court were to accept Mr. Smothers' assertions as true, a conviction for RICO conspiracy does not require those findings as to Mr. Smothers.

Under applicable Second Circuit law, the government is not required to prove for RICO conspiracy that Mr. Smothers

committed specific predicate acts in furtherance of the conspiracy, nor even that Mr. Smothers "knew of all [of the] criminal acts by insiders in furtherance of the conspiracy." *United States v. Applins,* 637 F.3d 59, 77 (2d Cir. 2011) (citation omitted); *see also Salinas v. United States,* 522 U.S. 52, 63 (1997) (the government need not establish that the defendant "committed or agreed to commit two predicate acts himself"). Rather, the government must prove that "the defendant participated in some manner in the overall objective of the conspiracy," as discussed *infra*. *See Curry,* 542 F. Supp. at 201 (citing *Yannotti*, 541 F.3d at 121-22).

### C. Sufficiency of Evidence as to Count One

Sufficient evidence at trial supported Mr. Smothers' racketeering conspiracy conviction charged in Count One.

It is well-established that "[t]hough the substantive RICO offenses require proof of an enterprise and a pattern of racketeering activity, the establishment of an enterprise is not an element of the RICO conspiracy offense . . . [t]he government need only prove that the defendant knew of, and agreed to, the general criminal objective of a jointly undertaken scheme." *White,* 7 F.4th at 98-99. In turn, "the object of a racketeering conspiracy is to conduct the affairs of a charged enterprise through a pattern of racketeering, *not to commit discrete predicate acts*." *Zemlyansky*, 908 F.3d at 11 (citing *United States v.*

*Pizzonia*, 577 F.3d 455, 459 (2d Cir. 2009)) (emphasis added). Although "proof of the actual existence of a RICO enterprise [is] not necessary to convict on a conspiracy charge," it can be "highly relevant to establishing an alleged RICO conspiracy." *White*, 7 F.4th at 99. Here, there was sufficient evidence at trial to establish the existence of E.A.M., the charged racketeering conspiracy, and to establish that E.A.M. itself "was undoubtedly an enterprise engaged in racketeering activity." *See Curry*, 542 F. Supp. 3d at 201.

Significant evidence at trial would support a juror's finding that E.A.M. had "general criminal objectives," and that E.A.M. engaged in racketeering activity. Warren testified about members selling drugs and how members would commit acts of violence to protect E.A.M., which, in turn, would increase their status within the organization. (Tr. at 260-63; *see also id.* at 277, 325, 449-51, 1051-52.) E.A.M. was also in disputes with multiple rival gangs, some of which led to E.A.M. committing acts of violence. (*See, e.g., id.* at 277-79, 304-21, 449-51, 459-61.) Specifically, E.A.M. members knew that they might have to commit violent acts on behalf of the gang, as it was "part of the culture." Individuals were also required to take an oath when joining E.A.M., which set forth these expectations. (*Id.* at 277-79 ("And by learning these oaths, you know that your loyalty is to the gang and you'll die for that gang."), 1043-44; *see also id.* at 1116-17 (members were

expected to "put[] in the work" to "be noticed by the gang" including "hurting someone if necessary, or . . . trying to get your name up, being tough, standing your ground when you need to, handling your beef with somebody if necessary").)

Witnesses testified at length about the inception, evolution, and existence of E.A.M., including that E.A.M. was a particular subset of the New York Blood Nation, itself a part of the Bloods gang. (*See, e.g., id.* at 246-48, 1066-70.) Witnesses also testified as to the structure and operations of E.A.M., including the hierarchy of individuals within E.A.M. (*Id.* at 250-51, 257-58, 1066-72.) Warren testified that at one point, he served as the "town GF" (i.e., second in command) of E.A.M. (*Id.* at 258.) *See, e.g., United States v. Davis*, No. 21-1486, 2023 WL 4582002, at *2 (2d Cir. July 18, 2023) ("[T]rial testimony established that committing crimes on behalf of [the gang] could increase members' status, such as by helping them become a 'big K,' or 'a high-ranking member.'").

E.A.M. members and associates would make money via selling drugs (specifically crack cocaine and marijuana), committing fraud, or committing robberies, and then would contribute to the "kitty" (i.e., E.A.M.'s "money system") which would be collected at meetings. (Tr. at 261-63, 279-80, 1169-71.) Money from the kitty was used, among other purposes, for drugs, weapons, and to help E.A.M. affiliates who were incarcerated, or

needed help paying bills and rent.  (*See id.; see also id.* at 261
("It could be used to help the homies that's locked up."); at 1170
("[J]ust a collective of money, you know, brought up and collected
. . .and, you know, put towards people that are locked up.").)
E.A.M. also conducted official meetings, where issues such as ways
to make money or a change in leadership were discussed.  (*See,
e.g., id.* at 262; 1168-69.)   The jury was also presented with
significant corroborating evidence, including documents describing
E.A.M's oaths and salutes, E.A.M.'s internal hierarchy (some of
which identified Mr. Smothers as an E.A.M. leader), and notes about
E.A.M. meetings and discussions.  (*See, e.g.,* GX 1003; GX 1005; GX
1102.)

          In light of this evidence, there was a sufficient basis
for a rational juror to find the existence and general criminal
objectives of E.A.M. as a RICO enterprise beyond a reasonable
doubt.  *See Davis*, 2023 WL 4582002, at *2 (citing *United States v.
Delgado*, 972 F.3d 63, 79-80 (2d Cir. 2020), *as amended* (Sept. 1,
2020) (finding general criminal objective of drug dealing when
"[g]ang members worked together to distribute drugs in their
territory, organizing themselves into a loose hierarchy of roles
and responsibilities")); *see also United States v. Mack*, No. 18-
cr-834 (PAE), 2020 WL 114509, at *6 (S.D.N.Y. Jan. 10, 2020)
("[T]estimony from [gang's] insiders alone, which the jury was at
liberty to credit, supplied a solid basis to find that the gang

existed along the lines charged. There was vast corroborative evidence received of the existence and activities of [the gang].").

The government also presented sufficient trial evidence that Mr. Smothers "knowingly and willfully joined [E.A.M.] and, through that involvement, participated in a racketeering conspiracy." *See Curry*, 542 F. Supp. 3d at 201. Not only did witnesses identify Mr. Smothers as an E.A.M. member (and eventual leader), but the government introduced evidence that Mr. Smothers admitted to being a part of the Bloods in 2007, and admitted that he was part of E.A.M. in 2008. (GX 601; *see also* Tr. at 1092-99.) Further, photographs from Mr. Smothers' own phone depicted Mr. Smothers with other E.A.M. members at a 2019 "universal meeting," in which the various Milla sets came together to determine who would lead the New York Bloods. (Tr. at 1099-1102; GX 1222A-H.) The jury also heard testimony that Mr. Smothers eventually rose up within the ranks to eventually become not only the leader — also known and referenced as the "top boss," the "godfather," and the "big homey" — of E.A.M., but the leader of the New York Bloods, the organization that oversaw E.A.M. and other Bloods sets. (*See, e.g.,* Tr. at 258-59, 262, 282-84, 523-24, 1035-36, 1074-78.) Text messages between Mr. Smothers and other members of E.A.M. discussing E.A.M. affairs were also introduced into evidence. (*See, e.g.,* GX 1201 (Mr. Smothers ordering that a known E.A.M. member gets a "physical"); Tr. at 1117-19 (Campbell explaining

"physicals" as someone in E.A.M. being beaten up as a form of discipline).)

There was also sufficient evidence at trial to establish that Mr. Smothers participated in the objectives of the conspiracy with the intent that he or another E.A.M. member would commit two or more racketeering acts of the types specified in the Indictment. (Tr. at 1686 (instructing the jury on this element).[2])  During an E.A.M. meeting, Mr. Smothers himself explicitly discussed credit card fraud and drug dealing as activities that members participated in to make money for E.A.M. as a whole.  (*Id.* at 1168-69.) Cooperating witnesses testified that they and other E.A.M. members engaged in selling drugs and committing credit card fraud. (Tr. at 280, 575, 1112, 1157-58, 1167-69; GX 714 (fake credit cards seized from co-defendant Tyshawn Corbett's storage unit); GX 719 (narcotics seized from Corbett's vehicle).)

As noted above, it is not required that a jury find that a defendant charged with RICO conspiracy committed, or even agreed to commit, two such acts *himself*.  Evidence at trial, however, not

---

[2] The Court instructed the jury on each of the four types of predicate acts charged in Count One of the Indictment, and provided extensive instructions on each: (1) acts involving fraud and related activity in connection with identification documents, in violation of federal law, specifically 18 U.S.C. § 1028; (2) acts involving fraud and related activity in connection with access devices, in violation of federal law, specifically 18 U.S.C. § 1029; (3) acts involving murder, in violation of state law, specifically New York State Penal Law §§ 125.25, 110.00, 105.15, and 20.00; and (4) acts involving dealing in controlled substances, in violation of federal law, specifically 21 U.S.C. §§ 841 843, and 846.  (Indictment at 5; Tr. at 1687-1722.)

only established that Mr. Smothers (alongside other E.A.M. members) agreed to commit predicate acts, but in fact committed such acts.  Mr. Smothers himself sold crack cocaine and marijuana to make money, particularly on A-Block (referring to Ashford Street between Liberty Avenue and Glenmore Avenue).  (Tr. at 295, 391-93, 443, 1158; GX 50.)  As discussed *supra*, selling drugs was one of the primary ways for E.A.M. to make money.  Warren testified to selling drugs with Mr. Smothers, including from a "trap house" (i.e. "[s]omewhere you sell drugs") on "A-Block."  (Tr. at 394, 399; GX 50, GX 59.)  Mr. Smothers also supplied, and offered to supply, drugs to fellow E.A.M. members that they in turn sold. (Tr. at 280, 571, 1158-59; GX 215A, 216A; *see also* Tr. at 1160-61 (witness testifying that he saw Mr. Smothers making marijuana at the location depicted in GX 216A).)  The government also introduced text messages to and from Mr. Smothers discussing prices for a pound (or "plate") of marijuana.  (Tr. at 572-73; GX 1013.) Numerous other text messages further corroborated that Mr. Smothers sold drugs.  (GX 1211, 1213, 1302; *see also* Tr. at 1163-64.)  Jurors also heard testimony that E.A.M., including Mr. Smothers, had abundant access to guns, access that increased over time.  (Tr. at 301-04, 311-12, 377, 520.)

   The jury also heard evidence that Mr. Smothers consistently carried a firearm over the course of selling drugs on A-Block "every day," and stored weapons on A-Block in multiple

locations.  (*Id*. at 301-05.)  Warren testified that these firearms were used for "protection, for anybody that try to violate us, try to come to our block, sell[] drugs."  (*Id*. at 303; *see also id.* at 306 ("If somebody will come, try to sell on our block, if somebody would disrespect one of the E.A.M. members verbally or violently, we are to retaliate and show that we have more power.").)  The jury also heard corroborating jail recordings of phone calls between Warren and another E.A.M. member discussing how A-Block was "Chucky's block" and that Mr. Smothers' approval was required for others to sell drugs there, even if Mr. Smothers was not physically at A-Block.  (Tr. at 610-11; GX 407E.)  Testimony also established that Mr. Smothers conspired to "shoot back" at the rival Montauk crew in retaliation for members of Montauk shooting at E.A.M. (Tr. at 459-62.)

The jury also heard and saw evidence that Mr. Smothers shot Damian Bullock (also known as "Hex").  The shooting arose from a drug dispute between E.A.M. and the rival Fulton crew.  (*Id*. at 469-71.)  Individual "Dooley" (Mr. Smothers' "right-hand man") robbed an individual who worked for "Nuke," a member of the rival Fulton gang.  Bullock had been selling drugs with Nuke and came to A-Block to retaliate against Dooley for the robbery.  Mr. Smothers, in turn, then shot Bullock seven times in retaliation, which eventually led to Bullock's leg being amputated.  (*Id.;* GX 3500-DB-4.)  Not only did Bullock testify at trial (in a wheelchair),

but the jury heard multiple statements and identifications of Mr. Smothers made by Bullock at the time of the shooting and subsequently. This included a 911 call where Bullock identifies "Chucky" as his shooter (GX 400); Bullock's identification of Mr. Smothers as his shooter in a photo array (GX 600); Officer Joseph Nicosia's trial testimony that when he responded to the scene, Bullock stated that he had been "shot by Chucky" (Tr. at 1008); Bullock's 2011 state grand jury testimony that Mr. Smothers shot him seven times (GX 3500-DB-4); and Bullock's 2012 state grand jury testimony that Mr. Smothers shot him and had attempted to intimidate Bullock not to cooperate with law enforcement regarding the shooting incident (GX 3500-DB-6).

To the extent that Mr. Smothers argues Bullock's testimony was "inherently contradictory" (Def. Mot. at 8) because Bullock claimed at trial that Mr. Smothers did not shoot him in 2011, the jury was permitted to draw the inference that Bullock chose not to identify Mr. Smothers as his shooter at trial because he felt scared or intimidated — particularly in light of the fact that the jury also saw and heard portions of Bullock's 2012 state grand jury testimony describing attempts by Corbett and Mr. Smothers to discourage Bullock from "get[ting] police involved" with the dispute. (GX 3500-DB-6; *see also* Tr. at 981-84 (Bullock's state grand jury testimony that, upon seeing Mr. Smothers several times after the shooting: "I thought . . . either he going to shoot

me or I was just thinking about a whole lot of things, like me be shot again or him coming, talking to me, or like trying to convince me, anything. I was thinking about anything, he could've kidnapped, anything. . . Made me feel scared" and "[Mr. Smothers] was just sitting there looking mad, like he really wanted to do something to me, but at the time it wasn't the right place[.]").)  The jury had the right to assign greater weight or credibility to Bullock's prior statements and testimony rather than his testimony at Mr. Smothers' trial, and the Court must defer to such assessment by the jury. *See White*, 7 F.4th at 98.

Further, as discussed above, evidence at trial established that E.A.M. members increased their "status" within E.A.M. by committing certain acts, such as shootings, as it demonstrated that those individuals "have loyalty, respect for the gang and they are willing to do whatever for the gang." (Tr. at 260; 1112-14 (Campbell describing acts of violence he committed because an EAM member asked him to).)  For example, E.A.M. was involved in significant rivalries with other drug trafficking groups, and E.A.M. members were expected to engage in violence on behalf of E.A.M. if other groups attempted to sell their drugs in their territory, such as in the "A-Block" territory.  (Tr. at 303-08.)  Warren testified at length about acts of violence, including "assaults, robberies, shootings, fraud, murders," in which he participated on behalf of E.A.M, in particular to retaliate against

E.A.M.'s rivals.  (*See, e.g.,* Tr. at 255-56 ("Went to war with anybody that went against us, that try to take our blocks, that try to disrespect us. We would go to war, like, we . . . attack them, they might attack us back.").)  Warren also testified that Mr. Smothers was one of the E.A.M. members who fired weapons or guns at drug rivals. (*Id*. at 307-08.)  E.A.M. members also engaged in shootings arising from disputes with the Montauk and Linwood crews.  (*Id*. 320-30; *see also* GX 215A.)

Moreover, Warren described how he and Mr. Smothers agreed that one of them would murder Kayne Harris (also known as "Fresh"), as part of a long ongoing dispute between multiple E.A.M. members and Harris.  Warren had previously ordered an assault on Harris while the two were incarcerated at Rikers, because "Fresh violated by shooting at a friend of mine [who was] an E.A.M. member."  (Tr. at 600-02.)  Following Warren and Harris' release from Rikers, Harris shot at the car that Mr. Smothers was sitting in.  (*Id*. at 632-38.)  Warren and Mr. Smothers later discussed a plan to murder Harris.  (*Id*. at 648-49.)  Warren subsequently shot Harris, ultimately paralyzing him, and thereafter had a meeting with Mr. Smothers and co-defendants Tyshawn Corbett and Qawon Allen to discuss the shooting.  (*Id*. at 651-57.)  Warren called Mr. Smothers because he knew that Mr. Smothers was "adamant that he wanted Fresh to be shot, and . . . I wanted to let [Smothers] know that I did that for him."  (*Id*. at 652.)  Mr. Smothers also informed

Warren that Allen had called Mr. Smothers previously to inform him of Harris' whereabouts, but that Mr. Smothers had been "busy" at that time.  (*Id.* at 656-57.)  Corroborating evidence, such as Warren's contemporaneous text messages regarding Harris shooting at him and Mr. Smothers, and regarding retaliation against Harris, were also introduced at trial.  (GX 404E, 410E, 1018, 1020.)

Accordingly, based on the abundant evidence introduced at trial, a rational juror could have found that Mr. Smothers guilty beyond a reasonable doubt of the essential elements of racketeering conspiracy.  A court may only enter an acquittal pursuant to Rule 29(c) "when there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt."  *White*, 7 F.4th at 98 (internal quotations omitted).  The Court concludes that is simply not the case here.

## II. Rule 29 - Possession of a Firearm During a Drug Trafficking Crime (Count Two)

### A. Sufficiency of Evidence as to Count Two

The jury was instructed extensively on three separate ways by which they could find Mr. Smothers guilty beyond a reasonable doubt on Count Two: if he (1) knowingly and intentionally possessed a firearm in furtherance of a drug trafficking crime (Tr. at 1722-26); (2) aided and abetted another in using or carrying a firearm during and in relation to, or in possessing a firearm in furtherance of, a drug trafficking crime

22

(*id.* at 1726); or (3) by reasonably foreseeing the use of a firearm during the commission of the substantive crime charged in Count Two by a co-conspirator of the conspiracy charged in Count One — in other words, via *Pinkerton* liability (*id.* at 1727-29).

As discussed *supra*, evidence at trial established that Mr. Smothers sold crack cocaine and marijuana.  Mr. Smothers sold drugs on A-Block "every day" and carried a firearm when doing so "all the time."   (Tr. at 301-02, 399; *see also id.* 1158-59 (Campbell testifying that Mr. Smothers sold "weed and crack" and offered Campbell "a pound . . . of weed to sell").)  The jury also heard testimony that Mr. Smothers stored weapons in various locations on A-Block:

> In the building, [Mr. Smothers] stashed one in the mailbox, in a red mailbox, at [an associate's] house, in the alleyway, behind the grass, across the street in the trap house. Then it was a building. We used to put a gun in that mailbox and there was guns, like three floors that guns used to be there too.

(*Id.* at 301-02; *see also id.* at 399-400.)

Other evidence corroborated this testimony, including photographs showing that one of the buildings on A-Block where Mr. Smothers stashed firearms was the same building where he shot Bullock in 2011.  (GX 59; Tr. at 302, 392-400; *see also* GX 60-62; Tr. at 922-26 (testimony of detective who responded to the 2011 shooting and was present at the crime scene).)  Further, E.A.M. had abundant shared access to guns, access that increased over

time.  (Tr. at 311-12, 400, 582.)  The firearms were used for "protection, for anybody that try to violate [E.A.M.], try to come to [E.A.M.'s] block, sell[] drugs." (*Id.* at 303; 573-74.)  When asked "Why did you have firearms on you when you sold drugs?" Warren testified that "If somebody will come, try to sell on our block, if somebody would disrespect one of the E.A.M. members verbally or violently, we are to retaliate and show that we have more power." (*Id.* at 306; *see also id.* at 377 ("[S]elling drugs or being part of a gang[,] you always have rivals, you always have people that rob you, disrespect and we always got to keep our respect. We always get to keep our power, and the way of doing that is having a gun just in case people try to do these things to us."); *id.* at 581 ("[A]ny time we did go out, [Mr. Smothers] . . . had [a] gun with us, yes.").)  Exhibits also showed that one of E.A.M.'s listed "rules" was to "always be up and ready," which Warren explained meant "[a]lways have protection on you, always have a gun on you." (GX 1003; Tr. at 520.)  Given the totality of the evidence, a rational juror could have found Mr. Smothers guilty on Count Two beyond a reasonable doubt.

### B. Mr. Smothers' *Pro Se* Supplemental Brief

On August 9, 2023, Mr. Smothers submitted, without leave from this Court, a *pro se* supplemental brief to his then-fully briefed Rule 29 and Rule 33 motions. (ECF No. 372.)  The government filed its response on September 6, 2023, and Mr. Smothers filed

his reply brief (this time, via counsel) on September 13, 2023. (ECF Nos. 384, 388.)  In his *pro se* brief, Mr. Smothers argued — raising the issue to this Court for the first time — that a judgment of acquittal is warranted on Count Two because the RICO conspiracy offense charged in Count One was not a "drug trafficking crime" under 18 U.S.C. § 924(c)(2).  (Def. Supp. Mot. at 4.[3])  Section 924(c)(2) defines "drug trafficking crime," *inter alia*, as "any felony punishable under the Controlled Substances Act[.]"

Count Two charged that Mr. Smothers, "together with others, did knowingly and intentionally use and carry one or more firearms during and in relation to a drug trafficking crime, to wit: the crime charged in Count One, and did knowingly and intentionally possess such firearms in furtherance of said drug

---

[3] The "plain error" standard applies to post-trial claims that could have been but were not raised during trial.  *United States v. Williams*, No. 13-cr-419 (LDH), 2021 WL 620906, at *2 (E.D.N.Y. Feb. 17, 2021) (quotation marks and citation omitted); *United States v. Petit*, No. 19-cr-850 (JSR), 2021 WL 673461, at *9 (S.D.N.Y. Feb. 21, 2021), *aff'd*, *United States v. Petit*, 2022 WL 3581648 (2d Cir. Aug. 22, 2022).  Mr. Smothers' argument here clearly could have been raised before or during trial, even as early as a motion to dismiss the indictment stage.  Per *Greer v. United States*, a defendant must satisfy three threshold requirements:

> *First*, there must be an error. *Second*, the error must be plain. *Third*, the error must affect "substantial rights," which generally means that there must be "a reasonable probability that, but for the error, the outcome of the proceeding would have been different." . . .
> If those three requirements are met, an appellate court may grant relief if it concludes that the error had a serious effect on "the fairness, integrity or public reputation of judicial proceedings."

141 S. Ct. 2090, 2096-97 (2021) (citations omitted).

trafficking crime." (Indictment at 6.) Count One (Racketeering Conspiracy), in turn, charged that the "pattern of racketeering activity . . . consisted of," among other predicate acts, "multiple offenses involving dealing in controlled substances, in violation of Title 21, United States Code, Sections 841, 843 and 846." (*Id.* at 5.)

Contrary to Mr. Smothers' argument here, under Supreme Court precedent, an offense does not have to be clearly listed in the CSA to be "punishable under [the CSA]" pursuant to Section 924(c) — even *state* offenses may sometimes constitute a "drug trafficking crime" for purposes of this subsection. *See Moncrieffe v. Holder*, 569 U.S. 184, 188 (2013) ("A conviction under either state or federal law may qualify, but a state offense constitutes a felony punishable under the Controlled Substances Act only if it proscribes conduct punishable as a felony under that federal law.") (internal quotation marks and citation omitted). As *Moncrieffe* provides, the appropriate question is a "categorical inquiry" as to "whether the record of conviction of the predicate offense necessarily establishes conduct that the CSA, on its own terms, makes punishable as a felony." *Id.* at 197-98; *see also Colotti v. United States*, 71 F.4th 102, 110-12 (2d Cir. 2023) ("[R]ICO is a divisible statute appropriate for use of the modified categorical approach. . . . The modified categorical approach requires us to turn to the charged predicate acts that constitute the pattern of

racketeering[.]")(citing *United States v. Laurent*, 33 F.4th 63 (2d Cir. 2022)).

As both parties note, the Second Circuit has not squarely addressed the specific question of whether RICO conspiracy can constitute a drug trafficking crime under § 924(c).  In *Capers*, however, the Second Circuit recently noted:

> Of course, if it *were* clear that the jury found that Capers used a gun in furtherance of the narcotics conspiracy charged as a predicate act in Count One [charging RICO conspiracy], that would be enough to affirm Capers's conviction, because it would mean that the jury necessarily rested its verdict on a drug trafficking crime.

*United States v. Capers,* 20 F.4th 105, 124 (2d Cir. 2021).

Here, Count One of the Indictment (RICO conspiracy) charged that the "pattern of racketeering activity . . . consisted of," among other predicate acts, "multiple offenses involving dealing in controlled substances, in violation of Title 21, United States Code, Sections 841, 843 and 846," which are each felonies "punishable under the CSA."[4]  (*See* Indictment at 5.)  In *Capers*, the Second Circuit noted that none of the jury instructions required the jury "to make a specific finding that . . . the

---

[4] As the government notes, although it is possible to commit a misdemeanor violation of 21 U.S.C. §§ 841 or 846 if the offense involved "a small amount of marihuana for no remuneration," 21 U.S.C. § 841(b)(4), such conduct would not constitute racketeering activity under RICO and is therefore not at issue here. *See* 18 U.S.C. § 1961(1) (defining "racketeering activity" to include only "*felonious* manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance" (emphasis added)).

narcotics conspiracy predicate to the RICO conspiracy offense" was the basis for its 18 U.S.C. § 924(j) verdict of guilty. *See Capers,* 20 F.4th at 124. In comparison, when instructing the jury on Count Two, the Court here charged as follows:

> The first element that the government must prove beyond a reasonable doubt is that the defendant committed a drug trafficking crime for which he might be prosecuted in a court of the United States.
>
> Count One of the indictment charges that acts involving violations of narcotics laws were committed or were intended to be committed as part of RICO conspiracy. I instruct you that if you find that Count One included an agreement to violate the narcotics laws as I described them earlier, then Count One is a drug trafficking offense.

(Tr. at 1723.)

The Court, in turn, had previously instructed the jury on each of the specific "narcotics laws" listed in Count One, namely, 21 U.S.C §§ 841, 843, and 846. (*Id*. at 1694-1704.) This was reiterated, again, in the verdict form provided to the jury, which instructed as to Count Two:

> <u>Only</u> if you unanimously find that the government has proven beyond a reasonable doubt that Mr. Smothers committed the crime alleged in Count One — either as a principal offender or aider and abettor — and that Count One included an agreement to violate the narcotics laws, answer the following question: How do you unanimously find the defendant QUANDEL SMOTHERS as to Count Two?

(ECF No. 324, Jury Verdict Form, at 3 (emphasis in original).)

This instruction was reiterated yet again when the jury
sent a note during deliberations asking, in part, "Does Count 2
specifically have to relate to a drug trafficking crime?"  The
Court's response to the jury note instructed: "Yes, Count Two must
relate to Count One if, and only if, the jury finds defendant
guilty of Count One, and the jury finds that Count One included an
agreement to violate the narcotics laws.  Please refer to
Instruction No. 38 [jury instructions as to Count Two]."  (ECF No.
319, Jury Notes 4 and 4A, at 1-3.)  This response was drafted after
a discussion with counsel for both parties, and Mr. Smothers
specifically assented to the finalized response before it was
provided to the jury.  (Tr. at 1739 ("Mr. Smothers would like —
well, I understand what we're proposing but the question is, does
Count Two specifically have to relate to a drug trafficking crime.
It's our understanding that . . . the answer is, yes, that [it]
does."; *id.* at 1741 ("Yes, it's acceptable.").)

Therefore, in convicting Mr. Smothers on Count Two, the
jury necessarily found that Count One "establish[ed] conduct that
the CSA, on its own terms, makes punishable as a felony,"
*Moncrieffe,* 569 U.S. at 197-98, specifically, an "agreement to
violate the narcotics laws" as instructed by this Court.[5]  (Tr. at

---

[5] The Court further notes that under Second Circuit precedent, § 924(c) "requires
only that the predicate crime of [drug trafficking] have been committed; the
wording does not suggest that the defendant must be separately charged with
that predicate crime and be convicted of it."  *Johnson v. United States,* 779
F.3d 125, 129-30 (2d Cir. 2015) (joining the consensus that "[e]very circuit

1701 (charging the jury on the Count One predicate act of 21 U.S.C. § 846).) Accordingly, the Court respectfully rejects Mr. Smothers' argument that RICO conspiracy involving an agreement to violate narcotics laws, as instructed by this Court, is categorically not a "drug trafficking crime" as defined in Section 924(c)(2).[6]

## III.   Rule 33

Mr. Smothers moves, in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33. In deciding a defendant's Rule 33 motion, a court must determine if a manifest injustice would result from allowing the guilty verdict to stand. *United States v. James*, 712 F.3d 79, 107 (2d Cir. 2013) (citations omitted); *United States v. Stewart,* 433 F.3d 273, 296 (2d Cir. 2006) (motions for a new trial "should be granted only with great caution and in the most extraordinary circumstances") (citations omitted).

Based on the trial record, for largely the reasons that this Court denies Mr. Smothers' Rule 29 motion, *supra*, it does not find Mr. Smothers' Rule 33 arguments persuasive, and he is therefore not entitled to a new trial. *See Curry*, 542 F. Supp. 3d

---

court to have considered the issue has concluded that § 924(c) does not require the defendant to be convicted of (or even charged with) the predicate crime, so long as there is legally sufficient proof that the predicate crime was, in fact, committed"); *see also United States v. Morris*, 61 F. 4th 311, 314 n.2 (2d Cir. 2023) (citing *Johnson*, 779 F.3d 125 at 129-30)).

[6] As to Mr. Smothers' retroactive misjoinder argument that if the Court vacates his Count Two conviction, his Count One conviction should also be vacated, the Court need not reach this argument as the Court declines to vacate his Count Two conviction.

at 206-07.   The majority of Mr. Smothers' arguments reiterate issues already presented to and decided by the Court in the instant order.   Apart from his general arguments "that the evidence against him was legally insufficient and that the witnesses at trial lacked credibility," Mr. Smothers does not articulate a compelling reason why "justice . . . requires" vacating his conviction and ordering a new trial.   *See Mack*, 2020 WL 114509, at *8.

### CONCLUSION

For the reasons set forth above, the Court DENIES Mr. Smothers' Rule 29 motion for a judgment of acquittal, or in the alternative, his Rule 33 motion for a new trial. The sentencing of Mr. Smothers shall proceed, and the Court shall enter a separate scheduling order as to sentencing briefing.

**SO ORDERED.**

_____
Hon. Kiyo A. Matsumoto
United States District Judge
Eastern District of New York

Dated:    October 13, 2023
          Brooklyn, New York